## IN THE UNITED STATES DISTR ICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL PAUL DETTY,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVL ACTION NO. 24-CV-6736** |
| | : | |
| **SERGEANT BECK,** *et al.*, | : | |
| **Defendants.** | : | |

### MEMORANDUM

**BAYLSON, J.**                                              **JANUARY  10, 2025**

  Plaintiff Michael Paul Detty, who is currently incarcerated at SCI Laurel Highlands, filed this civil action against several correctional officials based on the conditions in which he was previously incarcerated at the Bucks County Correctional Facility ("BCCF") as a pretrial detainee.  Detty seeks leave to proceed *in forma pauperis*.  For the following reasons, the Court will grant Detty leave to proceed *in forma pauperis* and dismiss the Complaint without prejudice to amendment.

### I.    FACTUAL ALLEGATIONS[1]

  The Complaint names seven BCCF employees as Defendants—Sergeant Beck, Corrections Officer Rizzo, Corrections Officer Hickmond, Corrections Officer Dowdy, Superintendent Ms. Reid, Sergeant Cruz, and Lieutenant Brown—as well as two nurses employed by PrimeCare identified only as Jane Doe-1 and Jane Doe-2.  (Compl. at 1, 2.)  Detty raises claims pertaining to assorted conditions in which he was confined at BCCF that can be grouped into two sets of events.  First, Detty brings claims related to an explosion on his unit and

---

[1] The following factual allegations are taken from Detty's Complaint (ECF No. 2), focusing on the allegations against the named Defendants.

how certain Defendants handled his medical care in the aftermath.  Second, Detty brings claims related to two separate occasions when other inmates flooded the unit on which he was housed with toilet water.

### A.  The Explosion and Related Events

The events giving rise to Detty's first set of claims began on December 14, 2022 at approximately 5:00 p.m., when Detty was awakened by a "very strong smell" that led him to believe "something was burning."  (Compl. at 2; 3, ¶ 1.)  Detty was locked into his cell on the bottom tier of the unit at the time, but from his cell he observed non-defendant Officer Swan look and sniff around the day room before going to his desk to make a phone call.  (*Id.* at 3, ¶¶ 2-3.)  After a few minutes, Defendant Sergeant Beck, who was also "look[ing] around while sniffing," asked Officer Swan to shut off the television in the day room and told the approximately forty inmates in the room "to listen up because som[e]thing was on fire and burning" and to "go upstairs and lock their cell doors behind them," which Detty alleges "we all did, [despite] the fact that the building was burning."[2]  (*Id.* at 3, ¶ 4.)

While in his cell, Detty overheard Beck asking an inmate named Tyler Perkins[3] about the smell, and heard Perkins tell Beck that his tablet "got so hot that he had to wrap it in his tee shirt."  (*Id.* at 3, ¶ 8.)  Beck allegedly threw the tablet in Perkins's toilet, which resulted in an explosion that caused toxic fumes to fill the area.  (*Id.* at 3, ¶¶ 5, 9.)  Beck then yelled for another correctional officer to open the top tier and announced, "Listen up everyone from the top tier go into the Gym, now let's go, move it to the Gym."  (*Id.* at ¶ 10.)

---

[2] Detty's use of the term "we" is confusing in light of his allegation that he was locked in his cell on the bottom tier of the unit at the time of these events.

[3] This inmate is referred to as Tyler Perkins, Tyler Prekins, and Taylor at different times throughout the Complaint.  The Court will use Tyler Perkins for consistency.

The Complaint is inconsistent as to the duration that Detty was left in his cell breathing the fumes during these events, and although he claims he told Beck at one point that he could not breathe, it is unclear when this happened relative to the other events, including the explosion and evacuation of the top tier of the unit.  (*Compare* Compl. at 3, ¶¶ 5-7 *with id.* at 3, ¶¶ 9-11.)  When Detty's cell door was finally opened, he was gasping for air because smoke was filling his lungs.  (*Id.* at 3, ¶ 12.)  Detty alleges that "a lot of smoke and toxic fumes were pouring into [his] cell," which was so thick it took him fifteen minutes to make it to the gym, during which his eyes were burning and he was experiencing chest pains.  (*Id.* at 4, ¶ 14.)  Detty felt dizzy upon arriving at the gym, asked to see a guard, and informed the guard that he thought he needed medical treatment.  (*Id.* at 4, ¶ 15.)

At some point thereafter, Detty was taken to the medical department.  (*Id.* 4, ¶¶ 16-17.)  Upon being escorted to the rest room at his request, he threw up on the floor.  (*Id.* 4, ¶ 17.)  A correctional officer asked Detty if he was alright, directed him to sit in the office, and called Defendant Officer Rizzo from sanitation to clean up the floor.  (*Id.* at 4, ¶¶ 17-19.)  Detty was then transported to the Doylestown Hospital with Perkins, who was also receiving treatment for exposure to the fumes.  (*Id.* at 4, ¶¶ 20-22; *id.* at 5, ¶ 30.)

In the emergency room at the hospital, a nurse by the name of Monica took Detty's vitals and told him he would be going for x-rays.  (*Id.* 4, ¶¶ 23-24.)  Detty told the nurse that he needed something to eat because he missed dinner.  (*Id.*  4, ¶ 24.)  He was given two packages of graham crackers and told that he should be fed when he returned to BCCF.  (*Id.* at 4, ¶¶ 25-26.)  The nurse also explained to Detty and a non-defendant officer who was also present,[4] that Detty

---

[4] The Complaint suggests that this officer could be either Officer Gielberth, Officer Black, or possibly both officers, neither of whom is a defendant in this case.  (*Compare* Compl. at 4-5, ¶¶ 26-27 *with id.* at 5, ¶ 28.)

should be brought back to the hospital "for further treatments" if he were to throw up after he eats. (*Id.* at 5, ¶ 27.)  When Detty returned to BCCF, he had a light meal and was taken to the dispensary, where he told a nurse about the discharge instructions. (*Id.* at 5, ¶ 28.)  At approximately 11:00 p.m., Detty reported that he was not feeling well and not eating,[5] but he was sent back to his cell block, C-4. (*Id.* at 5, ¶ 29.)

Upon return to his cell, Detty smelled the fumes from the explosion lingering on his personal items and, after several minutes, began to throw up. (*Id.* at 5, ¶¶ 31-32.)  He kicked his cell door, causing an officer to arrive, who called the dispensary. (*Id.* at 5, ¶¶ 33-34.)  When he arrived at the dispensary, Detty told Nurse Jane Doe-1 that he threw up, that he "felt very sick," and that he wanted to go back to the hospital in accordance with the discharge instructions. (*Id.* at 5, ¶ 34.)  Non-defendant Officer Black nodded, told Nurse Jane Doe-1 to give Detty something for his stomach, which she did, and then informed Detty he would not be sent to the hospital. (*Id.* at 5, ¶ 35.)  Detty asked Nurse Jane Doe-1 whether she was going to disregard the discharge instructions, and when she responded in the affirmative, Detty threatened to sue her. (*Id.* at 5, ¶¶ 36-37.)  Nurse Jane Doe-1 then directed Detty back to his cell block and told him she would have someone check on him in the morning. (*Id.* at 5, ¶ 38.)

The next morning, Detty "went to the Chow Hall" and "was finally able to get some sleep" even though his eyes still burned and he could still smell "the toxic fumes." (*Id.* at 5, ¶ 39.)  At some point, he was taken to the dispensary office for follow up, and he again began to throw up upon using the rest room. (*Id.* at 6, ¶¶ 40-41.)  Detty told the officer on duty that he needed to go back to the hospital in accordance with the nurse's discharge instructions. (*Id.* at 6,

---

[5] This allegation appears to conflict with Detty's allegation that he ate graham crackers and a light meal.

¶ 41.)  The officer then escorted Detty back to the dispensary office and called Defendant Officer

Rizzo to let him know that the bathroom needed to be cleaned.  (*Id.* at 6, ¶ 42.)

    In response to an inquiry from Nurse Jane Doe-2, Detty stated that "he just threw-up" and

explained that he had been exposed to toxic fumes following an explosion.  (*Id.* at 6, ¶ 43.)

Nurse Jane Doe-2 responded "that she knows all of this, and asked why Inmate Tyler was in the

Hole and he is not in the Hole," to which Detty responded he had not done anything to warrant

being put in the hole.  (*Id.* at 6, ¶ 44.)  Nurse Jane Doe-2 stated that Detty "looked fine to her," to

which he responded that "he had just thrown-up again, after throwing up all night long and that,

every time he eats something, it comes back up inspite [sic] of his lab test, or the starting him on

the medications to counter the toxic chemicals."  (*Id.* at 6, ¶ 46.)  Nurse Jane Doe-2 nevertheless

refused to send Detty to the hospital, so Detty stated he would sue her.  (*Id.* at 6, ¶ 47.)  It is

unclear whether there was a second visit to the hospital in the meantime and, if so, when this

conversation with Nurse Jane Doe-2 occurred relative to that visit.[6]  (*See id.* at 6, ¶ 45.)

    At some point during these events, Officer Rizzo gave Detty a pair of gloves and told him

to clean up his vomit even though Detty had told him he was "still really sick."  (*Id.* at 6, ¶ 48.)

Officer Rizzo told Detty that if he did not comply with the order, he would be sent to the RHU,

so Detty cleaned the floor.  (*Id.* at 6, ¶ 49.)  He returned to his cell but was later told by an officer

to pack his things because he was being taken to the RHU on A-Block.  (*Id.* at 6, ¶ 50.)

---

[6] This confusion results from the inclusion of an allegation in the portion of the Complaint
describing Detty's interactions with Nurse Jane Doe-2, which states Detty "was then taken to the
Hospital and, when he was released, Nurse Monica informed the Officers that, if he throws-up
again, he is to be brought back to the Hospital for further treatments." (Compl. at 6, ¶ 45.)  It is
unclear whether this allegation is a repetition of Detty's prior allegation about what happened
when he went to the hospital, or whether it describes a second visit to the hospital at some point
after Detty threw up following his return to BCCF.

Defendant Officer Hickmond[7] escorted Detty to the RHU, but since Detty's cell was not ready, Hickmond housed him in a holding cell and told Detty he "would be receiving a Bland Diet." (*Id.* at 7, ¶ 51.) Detty alleges that he did not receive his meal. (*Id.*) Later that day, Hickman took Detty to back to the RHU, where Detty told Defendant Officer Dowdy that "he never received his meal, and asked him to call the Kitchen to let them know that he was on the Special Tray List."[8] (*Id.* at 7, ¶ 52.) Officer Dowdy declined to do so. (*Id.*)

Detty was later moved to a cell in the RHU, which he alleges had no running water other than for the toilet. (*Id.* at 7, ¶ 53.) Detty informed Officer Dowdy of the situation. (*Id.*) Officer Hickmond told Detty that there were no other cells to put him in and added that Detty would "only be getting a regular dinner tray consisting of a Bland Diet." (*Id.*) Detty then learned that Nurse Jane Doe-2 had placed him on "24 hour Lock-In/Medical Watch." (*Id.* at 7, ¶ 54.) He claims that he only received "one meal during his 24 hour Lock-in" after which he was "escorted to C-Block," (*id.* at 7, ¶ 61), but he also alleges that he lost somewhere between four to six pounds in three days, (*Id.* at 7, ¶ 56). Detty further contends that he requested a shower and one hour of recreation consistent with BCCF policy, which he was refused by Officer Dowdy and Nurse Jane Doe-2 for the time he was held in the RHU, which he alleges was six days. (*Id.* at 7, ¶¶ 55 & 66.)

Detty claims that, after he spent six days in the RHU, staff confirmed that his cell lacked running water and represented to Detty that they would "take care" of his issues. (*Id.* at 7, ¶¶ 57-

---

[7] The Complaint identifies "Officer Hickmond" as a Defendant in the caption but uses "Officer Hickman" in the body of the Complaint. The Court understands these to refer to the same individual and will use "Officer Hickmond" for consistency.

[8] Despite this allegation about a "Special Tray List," it is not clear what special diet Detty was receiving because the Complaint does not contain any allegations about it.

59.)  Detty was ultimately brought to the dispensary, where he was seen by a nurse for blood work and vitals, and thereafter sent back to general population.  (*Id.* at 7, ¶¶ 59-60, ¶ 62.)  Detty claims that the same nurse later came to his cell to demand he sign a form stating "that he refused to take blood," which Detty initially declined to sign based on his belief that he was denied proper medical treatment, but later signed.  (*Id.* at 7, ¶¶ 64-65.)  On December 20, 2022, Detty filed a grievance (presumably about the events of the prior six days) and submitted a letter to Defendant Reid, who did not respond.  (*Id.* at 8, ¶ 67.)

### B.  Flooding on the Unit

The Complaint also describes two occasions when other inmates at BCCF flooded the unit where Detty was housed with water from the toilet.  On January 17, 2023, Detty began kicking his cell door because the toilet water flooded his cell.  (*Id.* at 8, ¶ 68.)  When Defendant Officer Cruz responded, Detty showed her the water.  (*Id.*)  Officer Cruz escorted Detty and other inmates to the day room and told them they "would get a hot meal and that [they] had to sign a paper in order to get paid $5.00 to clean cells, which [they] did for . . . seven (7) hours." (*Id.* at 8, ¶ 69.)  Detty alleges that "[u]pon information and belief, since the flood water was toxic . . . Defendant Cruz should not have had him clean such toxic waste with [sic] certification."[9] (*Id.* at 8, ¶ 70.)  When Detty confronted Cruz, she responded, "I am paying you $5.00, if you don't want to work go lock in your cell."  (*Id.* at 8, ¶ 71.)  Detty later "expressed his fear" to Reid that "Defendant Cruz had him [commit] a crime."[10]  (*Id.* at 8, ¶ 72.)  On January 19, Detty filed a

---

[9] The context suggests that Detty was concerned about a lack of "certification," although it is not clear what he means by "certification."

[10] It is unclear what crime Detty believes he was induced to commit, and no crime is apparent to the Court from Detty's allegations.

grievance in which he informed "Prison Staf[f] and Medical" that his "symptoms" were getting worse due to exposure to pollutants, but he did not receive a response to his grievance.  (*Id.* at 9, ¶ 81.)  It is not clear what symptoms he experienced as a result of this incident.

On February 2, 2023,[11] there was another flood that affected the bottom tier of the unit. (*Id.* at 8, ¶ 73.)  As with the prior flood, an officer—this time Defendant Officer Brown—arrived on the unit and escorted the inmates to the day room.  (*Id.* at 8, ¶ 74.)  "[S]taff hired seven (7) inmates to clean up the mess without masks or any protections from the toxic [fumes], all which took approximately five (5) hours."  (*Id.* at 8, ¶ 75.)  Detty does not allege that he was among the inmates who participated in the cleaning.  After Detty was back in his cell, Officer Brown yelled "Listen up, I'm tired of this ____, two weeks to the day, floods!" and added, "Now, so that you can't do it anymore, I am shutting off the water to every cell till further notice, you can live in that smell."  (*Id.* at 8, ¶ 76.)  In response, Detty began kicking his cell door until Brown told him, "Keep kicking and [you're] going to the Hole."  (*Id.* at 8, ¶ 77.)

Detty tried to reason with Brown by stating he was punishing both the inmates who caused the flood and the inmates who were not involved in causing the floods.  (*Id.* at 9, ¶ 78.) After approximately sixty-six hours, an officer flushed Detty's toilet for him.  (*Id.* at 9, ¶ 79.) Another officer flushed his toilet for approximately twenty-two hours, noting that he "had to smell the same toxic smells as well."[12]  (*Id.* at 9, ¶ 80.)  It is not clear how long this situation persisted.

---

[11] The Complaint states the date as 2022, which appears to be a typographical error.

[12] Detty identifies this Officer as "Defendant Fallen," (Compl. at 9, ¶ 80), but Fallen is not identified as a defendant in the caption of the Complaint or in the body of the Complaint where the Defendants are named.  Further, Detty has not alleged any plausible basis for a claim against Fallen based on this or any other allegation.

### C. Detty's Claims

Overall, Detty alleges that, as a result of being exposed to toxins, his vision has been impaired, he has constant headaches, he has respiratory illness and a persistent cough, and he has been prevented "from digesting essential nutrients." (Compl. at 9, ¶ 82.) He claims that the exposure as well as the "denial or delay of medical care sought" has caused him needless suffering. (*Id.*) Detty brings claims for the alleged violation of his constitutional rights based on the above events, as well as claims for medical negligence. (*Id.* at 2, 9.) He seeks damages.[13] (*Id.* at 10-11.)

## II.    STANDARD OF REVIEW

The Court will grant Detty leave to proceed *in forma pauperis* because it appears that he is incapable of paying the fees to commence this civil action.[14] Accordingly, 28 U.S.C. § 1915(e)(2)(B)(ii) requires the Court to dismiss the Complaint if it fails to state a claim. Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted); *Talley v.*

---

[13] Detty also seeks a declaration that his rights have been violated. (Compl. at 10.) However, declaratory relief is unavailable to adjudicate past conduct, so Detty's request for this declaratory relief is improper. *See Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (*per curiam*) ("Declaratory judgment is inappropriate solely to adjudicate past conduct" and is also not "meant simply to proclaim that one party is liable to another."); *see also Andela v. Admin. Office of U.S. Courts*, 569 F. App'x 80, 83 (3d Cir. 2014) (*per curiam*) ("Declaratory judgments are meant to define the legal rights and obligations of the parties in the anticipation of some future conduct.").

[14] Because Detty is a prisoner, he must still pay the $350 filing fee in installments as mandated by the Prison Litigation Reform Act.

*Wetzel*, 15 F.4th 275, 286 n.7 (3d Cir. 2021).  "At this early stage of the litigation,' '[the Court will] accept the facts alleged in [the *pro se*] complaint as true,' 'draw[] all reasonable inferences in [the plaintiff's] favor,' and 'ask only whether [that] complaint, liberally construed, . . . contains facts sufficient to state a plausible [] claim.'"  *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 774, 782 (7th Cir. 2015)), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024).  Conclusory allegations do not suffice.  *Iqbal*, 556 U.S. at 678.  As Detty is proceeding *pro se*, the Court construes his allegations liberally.  *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc*., 704 F.3d 239, 244-45 (3d Cir. 2013)).

In reviewing a *pro se* complaint, the Court will "apply the relevant legal principle even when the complaint has failed to name it."  *Id.*  However, "pro se litigants still must allege sufficient facts in their complaints to support a claim."  *Id.* (quoting *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013)).  An unrepresented litigant "cannot flout procedural rules — they must abide by the same rules that apply to all other litigants."  *Id.*  In that regard, a complaint may be dismissed for failing to comply with Federal Rule of Civil Procedure 8. *Garrett v. Wexford Health*, 938 F.3d 69, 91 (3d Cir. 2019).

Rule 8 requires a pleading to include a "short and plain statement showing that the pleader is entitled to relief," as well as a statement of the court's jurisdiction and a demand for the relief sought.  Fed. R. Civ. P. 8(a).  In determining whether a pleading meets Rule 8's "plain" statement requirement, the Court should "ask whether, liberally construed, a pleading 'identifies discrete defendants and the actions taken by [the named] defendants' in regard to the plaintiff's claims."  *Garrett*, 938 F.3d at 93 (citation omitted).  A pleading may still satisfy the "plain" statement requirement "even if it is vague, repetitious, or contains extraneous information" and

"even if it does not include every name, date, and location of the incidents at issue." *Id.* at 93-94.

The important consideration for the Court is whether, "a pro se complaint's language . . .

presents cognizable legal claims to which a defendant can respond on the merits." *Id.* at 94.

## III.    DISCUSSION

Detty asserts his constitutional claims pursuant to § 1983, the statute enabling a plaintiff

to raise claims for violations of the federal constitution.  "To state a claim under § 1983, a

plaintiff must allege the violation of a right secured by the Constitution and laws of the United

States, and must show that the alleged deprivation was committed by a person acting under color

of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  Since Detty was a pretrial detainee at the

time of the events in question, the Fourteenth Amendment, rather than the Eighth Amendment,

governs his conditions-of-confinement claims.  *See Hubbard v. Taylor*, 399 F.3d 150, 165-66 (3d

Cir. 2005).

Prison officials have a constitutional duty to provide humane conditions of confinement,

including adequate food, clothing, shelter, and medical care, and must take reasonable measures

to guarantee the safety of the inmates.  *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)

(internal quotation and citation omitted).  To establish a basis for a Fourteenth Amendment

violation, a pretrial detainee must allege that his conditions of confinement amount to

punishment.  *Bell v. Wolfish*, 441 U.S. 520, 538 (1979); *Camps v. Giorla*, 843 F. App' x 450, 452

(3d Cir. 2021) (*per curiam*) ("[A] court must determine whether the conditions complained of

were imposed for the purpose of punishment or whether it is merely incidental to a legitimate

governmental objective.").  "Unconstitutional punishment typically includes both objective and

subjective components." *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007).  "[T]he objective

component requires an inquiry into whether the deprivation was sufficiently serious and the

subjective component asks whether the officials acted with a sufficiently culpable state of mind." *Id.* (internal quotations and alterations omitted). To satisfy the subjective component of the analysis, a prisoner generally must assert that prison officials acted with deliberate indifference, meaning that they consciously disregarded a serious risk to the detainee's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991); *see Edwards v. Northampton Cnty.*, 663 F. App'x 132, 135 (3d Cir. 2016) (*per curiam*) ("[W]e agree with the District Court and find no reason to apply a different standard here as we have applied the 'deliberate indifference' standard both in cases involving prisoners and pretrial detainees." (internal citations omitted)).

When medical treatment is at issue, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs. *See Farmer*, 511 U.S. at 835. "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted). Deliberate indifference in this context is properly alleged "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004). Further, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, 'federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Davis v.*

*Superintendent Somerset SCI*, 597 F. App'x 42, 45 (3d Cir. 2015) (*per curiam*) (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).

To establish individual liability in a § 1983 action, the personal involvement of each defendant in the alleged constitutional violation is a required element, meaning a plaintiff must allege how each defendant was involved in the events and occurrences giving rise to the claims brought against that defendant.[15]  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998). In other words, "'[e]ach Government official, his or her title notwithstanding, is only liable for his or her *own* misconduct.'"  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018) (quoting *Iqbal*, 556 U.S. at 677) (emphasis in original).

"Suits against high-level government officials must satisfy the general requirements for supervisory liability."  *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017).  There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates."  *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015).  First, a supervisor may be liable if he or she "with deliberate indifference to the consequences, established and maintained a policy,

---

[15] Detty sued the Defendants in their individual and official capacities.  (Compl. at 11.)  Official capacity claims against a defendant are indistinguishable from claims against the entity that employs the defendant.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n. 55 (1978)).  In other words, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Id.*  To plead a basis for municipal liability under § 1983, a plaintiff must allege that the municipality's policy or custom caused the violation of his constitutional rights.  *See Monell*, 436 U.S. at 694; *see also Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003).  "To satisfy the pleading standard, [the plaintiff] must . . . specify what exactly that custom or policy was."  *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009).  Nothing in the Complaint suggests that the alleged constitutional violations at issue derived from a policy or custom of Bucks County or PrimeCare, which employ the Defendants, so the Court will dismiss Detty's official capacity claims.  The rest of the Court's analysis will focus on the claims against the Defendants in their individual capacities.

practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)). A supervisor may also "be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Id.* "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Rode*, 845 F.2d at 1207; *see also Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020).

### A. Claims Against Sergeant Beck

The Court understands Detty to be bringing claims against Sergeant Beck based on how he handled the situation with the burning tablet, and for delaying or denying medical treatment for injuries Detty sustained from being exposed to the fumes. (*See* Compl. at 3.) Courts have held that an inmate's Fourteenth Amendment rights are implicated if ventilation is inadequate to the point that it undermines health and/or sanitation. *See Brown v. Smith*, No. 23-780, 2024 WL 4094279, at *6 (E.D. Pa. Sept. 5, 2024) (citing cases); *see also Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) ("Inadequate ventilation and air flow violates the Eighth Amendment if it undermines the health of inmates and the sanitation of the penitentiary." (internal quotations omitted)). Similarly, the Fourteenth Amendment is violated if a defendant delays or denies care for an inmate's serious medical needs caused by exposure to fumes. *See Metz v. Tinde*, No. 11-01249, 2011 WL 5245440, at *2 (D. Nev. Nov. 1, 2011) (concluding that plaintiff stated a constitutional claim "based on his allegations that he was subjected carbon monoxide fumes that caused him to have chest pains, headaches, dizziness, shortness of breath, skin irritation, and

vomiting" and "based on inadequate medical care for his ailments resulting from the generator fumes").

It is *possible* that Detty has a basis for a deliberate indifference claim or claims against Beck, but the Court cannot conclude at this time that his claim is *plausible*. *See generally Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotations omitted)); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."). The Complaint reflects that the fumes were initially caused by an inmate who wrapped his tablet in a t-shirt when it got hot, and that Beck, in the process of investigating the incident (apparently to determine the source of the burning smell or extinguish flames) exacerbated the fumes when he threw the tablet in the toilet. (Compl. at 3, ¶¶ 4-5, 8-9.) The Complaint does not contain any allegations supporting a plausible inference that Beck's behavior was motivated by deliberate indifference, as opposed to negligence or a good faith (if ultimately misguided) effort to handle the matter of the burning tablet. Additionally, the ordering of factual allegations in this section of the Complaint confuses key details that form the basis for these claims as to the duration that Detty was left in his cell breathing the fumes, and when he told Beck he could not breathe relative to the other events going on at the time. (*Compare* Compl. at 3, ¶¶ 5-7 *with id.* at 3, ¶¶ 9-11.)

Absent clarity on what, specifically, happened with regard to the fumes and evacuation of Detty and other affected inmates to the gym, the Court cannot properly assess the plausibility of Detty's claims as they are pled. Because these inconsistencies make it difficult to understand and analyze the legal merit of Detty's claims against Beck, the Court will dismiss them in

accordance with Rule 8 and for failure to state a claim.  *See Palacios v. Corr. Officer Lamb*, No. 96-2472, 1997 WL 43217, at *2 (N.D. Ill. Jan. 27, 1997) (noting the difference between a correctional officer's failure to "arrive at [the prisoner's] gallery within a reasonable time simply because he was not where he was supposed to be," which would not be "cruel and unusual punishment because he was not intending to injure the prisoners" and allegations that "support an inference that [the officer] wanted the prisoners to suffer from the smoke and intentionally delayed releasing them from their cells"); *Butler v. Wetzel*, No. 23-00859, 2024 WL 4774889, at *6 (M.D. Pa. Nov. 13, 2024) ("Butler's subjective belief that the evacuation of the housing unit did not occur fast enough (even though he admits it took only '12 to 15' minutes, including initial time spent attempting to extinguish the fire) simply does not amount to a plausible allegation of deliberate indifference to a substantial risk to prisoner health or safety.").  Detty will be given leave to amend these claims in a manner that clarifies the facts underlying them.

### B.  Claims Against Nurses Jane Doe-1 and Jane Doe-2

Detty's brings constitutional claims against Nurses Jane Doe-1 and Jane Doe-2 for deliberate indifference to his medical needs because they did not send him to the hospital after he vomited.  Assuming, without deciding, that Detty's medical needs amounted to serious, he has not plausibly alleged that the nurses acted with deliberate indifference.

As to Nurse Jane Doe-1, the Complaint reflects that at some point after 11:00 p.m. on the night Detty returned from the hospital, he threw up and was treated by Nurse Jane Doe-1 with stomach medication.  (Compl. at 5, ¶¶ 29, 34-35.)  Nurse Jane Doe-1 also made arrangements for Detty to be checked on in the morning, which occurred after he had gone to "Chow Hall" (though it is unclear whether he was able to eat) and was in the process of getting some sleep.  (*Id.* at 5-6, ¶¶ 38-40.)  Although Nurse Jane Doe-1 did not send Detty back to the hospital after

he vomited, the Complaint indicates that she exercised her medical judgment in treating him with medication for his stomach and requiring a medical assessment of his condition the next morning. Even if her judgment was incorrect, her actions do not amount to deliberate indifference. *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("While the distinction between deliberate indifference and malpractice can be subtle, it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."); *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) ("If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a *doctor* disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness."); *McKinley v. Stanish*, No. 21-00960, 2022 WL 4369974, at *7 (M.D. Pa. Sept. 21, 2022) ("[W]here a dispute in essence entails no more than a disagreement between an inmate and doctors over alternate treatment plans, the inmate's complaint will fail as constitutional claims under § 1983 since the exercise by a doctor of his professional judgment is never deliberate indifference." (internal quotations omitted)). Notably, it is not clear what treatment Detty believes he would have or should have received at the hospital that renders Nurse Jane Doe-1's treatment decision improper under the circumstances. Nor does Detty plead facts from which one could conclude that his medical condition was such that it could only be treated at the hospital. Accordingly, Detty has not stated a plausible basis for a claim against Nurse Jane Doe-1.

Detty's allegations are also insufficient to state a claim against Nurse Jane Doe-2. This is in large part because his allegations are unclear as to the timeline of events pertaining to his interactions with Nurse Jane Doe-2 and what care, if any, he received from her. (*See* Compl. at

6, ¶¶ 43-47.)  In particular, the Complaint is not clear on whether Detty was sent to the hospital

on a second occasion, when (if at all) Detty received blood work given the references to blood

work in the Complaint, and how Detty's medical condition progressed following Nurse Jane

Doe-2's decision to have him placed in the RHU for medical observation.  Absent clearer

allegations about what happened and when, Detty has not complied with Rule 8 or stated a

deliberate indifference claim against Nurse Jane Doe-2.

Detty also brings medical malpractice claims against these Defendants.  "[M]edical

malpractice involves the 'unwarranted departure from the generally accepted standards of

medical practice resulting in injury to the patient, including all liability-producing conduct

arising from the rendition of professional medical services.'"  *Doe v. Hosp. of Univ. of

Pennsylvania*, 546 F. Supp. 3d 336, 344 (E.D. Pa. 2021) (quoting *Grossman v. Barke*, 868 A.2d

561 (Pa. Super. Ct. 2005)).  To state a claim for medical malpractice under Pennsylvania law, a

plaintiff must allege: (1) the medical professional owed a duty to the patient; (2) the medical

professional breached the duty; (3) the breach was the proximate cause of the harm suffered; and

(4) the damages suffered were a direct result of the harm.  *Brown v. Hahnemann Univ. Hosp.*, 20

F. Supp. 3d 538, 542 (E.D. Pa. 2014) (citing *Hightower-Warren v. Silk*, 698 A.2d 52, 54 (Pa.

1997)).  Since, as discussed above, Detty has not clearly alleged how either Nurse breached the

relevant medical standard of care, Detty has also failed to state a medical negligence claim

against the Doe Nurses.

### C.  Claim Against Officer Rizzo

Detty's claim against Officer Rizzo is based on Rizzo requiring Detty to clean his vomit.

(Compl. at 6, ¶¶ 48-49.)  Detty alleges this incident occurred occurred "[u]pon leaving the back"

area of the dispensary office where he had just interacted with Nurse Jane Doe-2.  (*See id.* at 6,

¶¶ 47-48.)  "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with . . . deliberate indifference."  *Spruill*, 372 F.3d at 236.  Given the sparse (and, as noted above, often unclear) allegations about the circumstances surrounding this incident, the Court cannot conclude that Rizzo acted with deliberate indifference to Detty's health by making him clean his vomit since he had just been seen by a medical professional and was, at that time, apparently cleared to return to his unit, (*see* Compl. at 6, ¶ 50).  Notably, Detty does not allege that Rizzo interfered with his ability to get medical care or meaningfully worsened his health condition.  Accordingly, as pled, the Complaint does not state a deliberate indifference claim against Rizzo.

### D.  Claims Against Officers Hickmond and Dowdy

Detty's claims against Officers Hickmond and Dowdy pertain to the conditions in which he was kept in the RHU, specifically, he missed a meal while in transit between cells, was given a bland diet instead of a special diet, did not receive a shower or recreation in the yard, and was housed in a cell without running water apart from the water in the toilet.  (Compl. at 7-8, ¶¶ 51-56, ¶ 66.)

"[P]risoners are entitled to a nutritionally adequate diet," *Tapp v. Proto*, 718 F. Supp. 2d 598, 621 (E.D. Pa. 2010), *aff'd*, 404 F. App'x 563 (3d Cir. 2010), "includ[ing] . . . a medically appropriate diet when necessary."  *Scinto v. Stansberry*, 841 F.3d 219, 233 (4th Cir. 2016) (citing cases).  Whether the deprivation of food is objectively serious for purposes of establishing a constitutional violation "depends on the amount and duration of the deprivation."  *Duran v. Merline*, 923 F. Supp. 2d 702, 720 (D.N.J. 2013) (internal quotations omitted).  *Compare Lindsey v. O'Connor*, 327 F. App'x 319, 321 (3d Cir. 2009) (*per curiam*) ("The purported

deprivation of a single meal is not of such magnitude as to rise to the level of a constitutional

violation") *with Cooper v. Sheriff, Lubbock Cnty., Tex.*, 929 F.2d 1078, 1081, 1083 (5th Cir.

1991) (finding that failure to feed a prisoner for twelve consecutive days violated the Eighth

Amendment).

 Detty's allegations about the denial of food are too unclear as pled to state a claim. Detty

alleges that he missed one meal, which does not on its own amount to a constitutional violation.

*See Zanders v. Ferko*, 439 F. App'x 158, 160 (3d Cir. 2011) (*per curiam*) (concluding that "the

alleged deprivation of three meals over two days [to a diabetic inmate] fails to rise to the level of

constitutional violation"); *see also Garrett v. Gonzalez*, 588 F. App'x 692 (9th Cir. 2014)

(affirming dismissal of Eighth Amendment claim where the *pro se* plaintiff failed to allege

sufficient facts showing that the deprivation of three consecutive meals "resulted in any pain or

injury to his health"); *Adderly v. Harry*, No. 13-1465, 2015 WL 5016501, at *4 (M.D. Pa. Aug.

21, 2015) (concluding that deprivation of lunch one day and breakfast and lunch the following

day failed to state an Eighth Amendment claim). The Complaint also reflects that Detty was

concerned about receiving a bland diet when he was "on the Special Tray List," (Compl. at 6, ¶

52), but he does not explain what this means. Accordingly, it is not clear whether Detty is

alleging that he required a special diet for a medical (or any other) reason and, if so, how that

affected his ability to eat. It is also unclear whether he was ordered a bland diet for a medical

reason because of his repeated vomiting. Although it is concerning that Detty claims to have lost

"approximately four (4) to six (6) pounds in three days," (Compl. at 6, ¶ 56), his allegations are

currently too undeveloped to state a claim based on a denial of food or the receipt of a bland diet.

Also relevant is the absence of any information in the Complaint about what was going on with

Detty's medical condition while he was housed in the RHU, since he alleges that the vomiting

impacted his ability to eat.[16]  For these reasons, any claim based on denial of food or alteration of

Detty's diet is not plausible as pled.

Detty's allegations that he was denied a shower and exercise in the yard for six days also

do not state a sufficiently serious deprivation, especially since he does not describe how, if at all,

he was adversely impacted by these conditions.  *See, e.g., Barndt v. Wenerowicz*, 698 F. App'x

673, 676 (3d Cir. 2017) (*per curiam*) (concluding that the "denial of out of cell exercise and

showers for twenty-eight days" did not violate the constitution considering that the inmate did

not demonstrate any ill effects caused by those conditions and had other means of exercising and

keeping himself clean); *Fortune v. Hamberger*, 379 F. App'x 116, 122 (3d Cir. 2010) ("Fortune

complained of his inability to adequately shower and exercise for a period of fifteen days.

Although it is not clear how many times Fortune believes that he should have been permitted to

engage in those activities in addition to the time he was already given to do so, he does not allege

that he suffered any harm as a result of the denial of additional showers and exercise."); *Carroll

v. George W. Hill Corr. Facility*, No. 22-1720, 2022 WL 17539212, at *1, 10 (E.D. Pa. Dec. 8,

2022) (holding that denial of shower and exercise for eight days while placed in intake cell did

not constitute a Fourteenth Amendment violation); *Coleman v. Hodges*, Civ. A. No. 18-1152,

2018 WL 6618459, at *5 (W.D. Pa. Nov. 30, 2018), *report and recommendation adopted*, 2018

WL 6618408 (W.D. Pa. Dec. 18, 2018) ("To the extent that Plaintiff claims his mere placement

in the RHU and the mere imposition of the restrictions regarding a mattress, showers and

exercise for four days constituted 'punishment' as prohibited by *Bell v. Wolfish*, he fails to

---

[16] Detty's failure to include any allegations about his symptoms while in the RHU, including
whether and how his vomiting resolved and how Officers Dowdy and Hickmond interacted with
him, also precludes any claim for deliberate indifference to medical needs against these
Defendants.

comprehend the meaning of 'punishment' as used in *Bell* and in the Fourteenth Amendment

context concerning pre-trial detainees."). That is so even if the denial of showers and exercise

during Detty's time in the RHU violated prison policy, as he contends, (Compl. at 7, ¶ 55).[17] *See*

*Bowman v. Wetzel*, No. 20-00135, 2020 WL 3258946, at *6 (W.D. Pa. June 16, 2020) ("As many

courts have held, corrections officials cannot be held liable for failing to conform to procedures

outlined in inmate handbooks and other internal prison procedures."); *Laufgas v. Speziale*, No.

04-1697, 2006 WL 2528009, at *9 (D.N.J. Aug. 31, 2006) ("[A] prison's departure from the

policies and procedures outlined in the facility's handbook does not, in and of itself, amount to a

constitutional violation actionable under § 1983.").

Detty also contends that the cell where he was held for six days in the RHU lacked

running water. Depriving an inmate of drinking water for days is objectively serious. *See*

*Gibson v. Crouch*, No. 20-2021, 2022 WL 7352267, at *2-3 (3d Cir. Oct. 13, 2022) (*per curiam*);

*see also Wolfe v. Christie*, No. 10-2083, 2013 WL 3223625, at *5 (D.N.J. June 25, 2013)

("[T]here is no doubt that potable water constitutes a basic human need."). In that regard, the

severity of being held in a cell without running water depends on whether the inmate has other

sources of water available to him. *Compare Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210,

220, 228-29 (3d Cir. 2015) (holding that a complete lack of potable water for three days "other

than the water in a toilet bowl . . . poses a clear substantial risk of serious harm to an inmate" and

that inmate who did not have water in her cell and who was told to drink from the toilet bowl

when she requested water stated a claim (quotations omitted)) *with Collier v. Adams*, 602 F.

App'x 850, 853 (3d Cir. 2015) (*per curiam*) (holding that the deprivation of running water in cell

---

[17] To the extent Detty alleges that Nurse Jane Doe-2 also denied him a shower and recreation,
(Compl. at 7, ¶ 55), any claim against her based on these conditions fails for the same reasons.

for 77 hours was not sufficiently serious where plaintiff had access to "fluids such as milk each morning, and he never asked staff for water or fluids" and was constantly monitored).  Detty alleges that there was "no running water, only toilet water," (Compl. at 7, ¶ 53), in his cell, but it is not clear whether alternate sources of water or other liquids were available to him.  Nor does he allege that he was entirely deprived of potable water for days.  Accordingly, Detty's claim, as alleged, falls short of plausible.  *See Alpheaus v. Camden Cnty. Corr. Facility*, No. 17-0180, 2017 WL 2363001, at *14 (D.N.J. May 31, 2017) (concluding that plaintiff failed to state a claim based on his non-specific allegation of "no running water"); *see also Gardner v. Lanigan*, No. 137064, 2018 WL 4144689, at *4 (D.N.J. Aug. 30, 2018) ("While denial of access to drinking water can be an Eighth Amendment violation, here, it is not clear whether Plaintiff had access to alternative sources of water, nor how long water was denied to him." (citation omitted)).

In sum, Detty's allegations about the conditions in which he was held in the RHU do not, as pled, state a basis for a plausible constitutional violation against Officers Dowdy and Hickmond.  Accordingly, these claims will be dismissed without prejudice to amendment in the event Detty can provide additional relevant details in support of these claims.

### E.  Claims Against Sergeant Cruz and Lieutenant Brown

Detty's claims against Sergeant Cruz and Lieutenant Brown are based on how these Defendants responded on January 17, 2023, and February 2, 2023 respectively, when other inmates flooded the unit on which Detty was housed with toilet water.  (Compl. at 8-9.)  "Inmate exposure to sewage can constitute a serious risk to inmate health and safety and satisfy the objective component" of a constitutional claim.  *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001); *see also Fruit v. Norris*, 905 F.2d 1147, 1150-51 (8th Cir. 1990) (observing that "'common sense' suggests that [prison officials] should have had knowledge that unprotected

contact with human waste could cause disease").  "At the same time, the frequency and duration of the condition, as well as the measures employed to alleviate the condition, must be considered when considering the objective component."  *Shannon*, 257 F.3d at 1168; *Wilson v. Bucks Cnty. Corr. Facility*, No. 23-0912, 2023 WL 2920834, at *3 (E.D. Pa. Apr. 12, 2023) ("[A] plaintiff must allege facts about the duration and extent of the deprivation to establish how a basic need was not met, and must allege how he was harmed by the unsanitary conditions.").  However, since "exposure to human waste carries particular weight in the conditions calculus," *Martin v. Gearhart*, 712 F. App'x 179, 187 (3d Cir. 2017) (*per curiam*) (quoting *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001)), even relatively short exposures to human waste have been found to violate the constitution.  *See DeSpain*, 264 F.3d at 974 ("Exposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment." (citing cases)).

Detty has not stated a claim against Defendant Cruz or Defendant Brown based on the occasions when his cell flooded with water from the toilet.  According to Detty's allegations, both Cruz and Brown responded to Detty when he kicked his cell door following the floods by escorting Detty and the other affected inmates into the day room.  (Compl. 8, ¶¶ 68-69 & 75.) Detty does not allege that he was forced to clean the toilet water—to the contrary, when he complained to Cruz with regard to the first incident, she gave him the option of going back to his cell if he did not want to participate in the work arrangement she offered, (*id.* at 8, ¶ 71), and his allegations regarding the second incident suggest that seven other inmates (not Detty) participated in the cleaning, (*id.* at 8, ¶ 75).  He contends that Defendant Cruz should not have permitted him to "clean such toxic waste with [sic] certification," (*id.* at 8, ¶ 70), but does not allege facts to support an inference that time he spent cleaning was done under conditions that

24

constituted a serious risk to his health or safety.  Indeed, although he describes the water as

"toilet water" and "toxic," (*id*. at 8, ¶¶ 68, 70), Detty does not allege that he was ever directly

exposed to human waste.  In sum, the Complaint does not plausibly allege that the conditions to

which Detty was exposed on these occasions were objectively serious.  Further, that the

Defendants both responded to the floods, removed Detty and the other inmates from their

flooded cells, and arranged for the mess to be cleaned, cuts against any inference of deliberate

indifference.  Accordingly, the Complaint does not state a plausible constitutional violation

against Defendants Cruz and Brown based on their responses to the floods.  *See Johnson v.*

*Guthrie*, No. 24-2170, 2024 WL 3824869, at *3 (E.D. Pa. Aug. 14, 2024) ("Although Johnson

asserts that the leaky toilet in his cell led to the accumulation of standing water that he had to

clean up with another inmate's assistance and caused the cell to smell like feces, he does not

allege that human waste flooded his cell, or that he had any unprotected contact with it. Even

when taken as true, those allegations are not enough to satisfy the objective prong."); *Moore v.*

*Rosa*, No. 21-0933, 2021 WL 1143376, at *5 (E.D. Pa. Mar. 25, 2021) (dismissing claim based

on allegations that cell flooded with contaminated water between 10 and 11 p.m. was not cleaned

by the next morning because plaintiff "failed to allege sufficient facts showing that the failure to

clean up the flooded cell in the timely manner he requested was punitive"); *Florio v. Canty*, 954

F. Supp. 2d 227, 235 (S.D.N.Y. 2013) (inmate failed to state Eighth amendment claims when he

was "exposed to waste only for brief periods; it appears that his total exposure was less than a

few hours"); *Wyland v. Brownfield*, No. 08-1601, 2011 WL 5445305, at *5 (W.D. Pa. Nov. 9,

2011) ("[H]aving to clean a moldy shower with backed up sewage without gloves or a mask on

[one] single occasion simply do[es] not give rise to a substantial risk of serious harm or

challenge common standards of decency"); *Ortiz v. Dep't of Corr. of City of New York*, No. 08-

2195, 2011 WL 2638137, at *7 (S.D.N.Y. Apr. 29, 2011), *report and recommendation adopted sub nom. Ortiz v. Hernandez*, 2011 WL 2638140 (S.D.N.Y. July 5, 2011) ("[W]here exposure to such waste is intermittent or limited to a matter of hours, courts normally will not entertain such actions").

Detty also has not stated a plausible claim against Brown based on his allegation that Brown shut off the toilets to prevent inmates from flooding the cells. The Complaint reflects that because Brown shut off the water, Detty was not able to flush his toilet for sixty-six hours and that, thereafter, other correctional officers flushed the toilet at his request. (Compl. at 9, ¶¶ 79-80.) It is unclear when the water was turned back on and how long the situation persisted. At most, Detty's Complaint supports an inference that he was required to smell odors from a toilet for a maximum of sixty-six hours. Although this was likely unpleasant, it does not amount to a constitutional violation, at least not as pled. *See Horst v. Litz*, No. 23-00917, 2023 WL 4827077, at *3 (M.D. Pa. July 27, 2023) (allegations that plaintiff "must eat in his cell next to the toilet which leaks and doesn't always flush, that there is mold in the cell, that there is toothpaste on the walls, that no cleaning products are provided, and that he can smell sewage and other body smells" described conditions that were "undoubtedly uncomfortable," but did not constitute "a sufficiently serious deprivation (*i.e.*, a denial of one of life's necessities) such that [plaintiff] is facing a substantial risk of serious harm." (internal quotations and citation omitted)); *Washington v. Wetzel*, No. 18-1390, 2022 WL 1782509, at *10 (W.D. Pa. June 1, 2022) (holding that plaintiff did not satisfy object component of constitutional analysis based on water being shut off to his toilet where, despite the unpleasant odor, he did not have to endure sewage in the toilet for more than two days and there were no allegations that the toilet overflowed or that plaintiff suffered any health consequences), *aff'd*, No. 22-2182, 2024 WL 5154024 (3d Cir. Dec. 18, 2024);

*Bracey v. Price*, No. 09-1662, 2012 WL 6015727, at *16 (W.D. Pa. Dec. 3, 2012) (exposure to "the smells of feces and urine for three days" did not amount to constitutional violation); *Smith v. United States Penitentiary Lee*, No. 11-00077, 2011 WL 767165, at *1 (W.D. Va. Feb. 25, 2011) (summarily dismissing Eighth Amendment claim based on allegations that inmate could not flush the toilet in his cell, causing "noxious fumes" to build up in the housing unit). In sum, since Detty has not alleged a plausible basis for a claim based on matters related to the floods in January and February, and the responses to the floods, Detty's claims based on these allegations will be dismissed.

### F. Claims Against Deputy Superintendent Reid

Detty's claims against Deputy Superintendent Reid are based on her failure to respond to Detty's letters or grievances about the conditions of his confinement, (Compl. at 8, ¶¶ 67, 72; *id.* at 9, ¶¶ 81, 85), and his assertion that Reid "was responsible for the overall operation of [BCCF,]" including implementation of procedures related to grievances and supervision and discipline of staff, (*id.* at 9, ¶ 84). These allegations do not state a claim against Reid.

"[P]risoners do not have a constitutional right to prison grievance procedures." *Gerholt v. Wetzel*, 858 F. App'x 32, 34 (3d Cir. 2021) (*per curiam*) (citing *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) and *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) (*per curiam*)). Accordingly, Detty cannot state a claim against Reid based on her alleged improper handling of or response to his grievances, or her alleged failures in implementing a grievance process. *See Woods v. First Corr. Med. Inc.*, 446 F. App'x 400, 403 (3d Cir. 2011) (*per curiam*) ("We agree with the District Court that because a prisoner has no free-standing constitutional right to an effective grievance process, Woods cannot maintain a constitutional claim against Lucas based upon his perception that she ignored and/or failed to properly investigate his grievances."

(internal citation omitted)); *Burnside v. Moser*, 138 F. App'x 414, 416 (3d Cir. 2005) (*per curiam*) (explaining that "[i]nmates do not have a constitutionally protected right to the prison grievance process" and that "a state grievance procedure does not confer any substantive constitutional right upon prison inmates" (internal quotations and citations omitted)). Furthermore, a prison official's involvement in the grievance process or receipt of letters from an inmate generally do not establish personal involvement in the underlying constitutional violation. *See Folk v. Prime Care Med.*, 741 F. App'x 47, 51 (3d Cir. 2018) (*per curiam*) ("Although some of these defendants were apparently involved in responding to some of Folk's prison grievances, there are no allegations linking them to the underlying incidents and thus no basis for liability based on those later grievance reviews."); *Diaz v. Warden Lewisburg USP*, 630 F. App'x 148, 151 (3d Cir. 2015) (*per curiam*) (prison officials who were administrators and who "are not themselves physicians" were not liable for deliberate indifference where plaintiff could not establish that their "involvement in the matter consisted of anything more than, at most, receiving letters from Diaz expressing his dissatisfaction with the medical care he was receiving"); *Burk v. Crowe*, No. 19-5792, 2020 WL 42758, at *4 (E.D. Pa. Jan. 3, 2020) (plaintiff's "general allegation that he 'wrote to' Crowe, Cassidy, Budd, and Lagana 'when this happen[ed]' is too vague and undeveloped to state a plausible basis for liability against these individuals").

Detty's remaining allegations against Reid based on her alleged supervisory failures are entirely conclusory. They suggest Detty has sued Reid because of her high-ranking position at BCCF, which is an insufficient basis upon which to hold her liable under § 1983. *See Robinson v. Delbalso*, No. 22-2378, 2022 WL 17248100, at *2 (3d Cir. Nov. 28, 2022) ("His conclusory statements that defendants Delbalso, Mason, and White 'created a policy or custom under which

unconstitutional practices occurred' are insufficient to allege personal involvement." (quoting *Parkell v. Danberg*, 833 F.3d 313, 331 (3d Cir. 2016) ("To presume that [unconstitutional] practices arose from [an official's] policies merely because of his position . . . is to rely on respondeat superior."))); *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005) (explaining that "merely hypothesiz[ing] that [a defendant] may have been somehow involved simply because of his position as the head of the [relevant office]" does not support an inference of personal involvement). Accordingly, the Court will dismiss Detty's claims against Reid.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Detty leave to proceed *in forma pauperis* and dismiss his Complaint. Detty will be given leave to file an amended complaint so that he has an opportunity to replead his claims in the event he can clarify the circumstances and events giving rise to those claims. An appropriate order follows, which provides further instruction as to amendment.

.

**BY THE COURT:**

**/s/ Michael M. Baylson**

_____

**MICHAEL M. BAYLSON, J.**