**IN THE UNITED STATES DISTR ICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL PAUL DETTY,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 24-CV-6736** |
| | : | |
| **SERGEANT BECK,** *et al.*, | : | |
| **Defendants.** | : | |

**MEMORANDUM**

**BAYLSON, J.**                                                                                    **MAY  1, 2025**

Plaintiff Michael Paul Detty brings this civil action pursuant to 42 U.S.C. § 1983 alleging that conditions in which he was previously incarcerated at the Bucks County Correctional Facility ("BCCF") as a pretrial detainee violated his constitutional rights.  After granting Detty leave to proceed *in forma pauperis*, the Court reviewed Detty's initial Complaint and dismissed it for failure to state a claim upon statutory screening.  *See Detty v. Beck*, No. 24-6736, 2025 WL 77080, at *13 (E.D. Pa. Jan. 10, 2025).  The dismissal was without prejudice to Detty filing an amended complaint "to replead his claims in the event he [could] clarify the circumstances and events giving rise to those claims."  *Id.*  Detty filed an Amended Complaint (ECF No. 13), which is currently before the Court for review.  For the following reasons, the Court will dismiss certain of Detty's claims and direct service of the Amended Complaint on the remaining Defendants so that Detty may proceed on his claims that pass statutory screening.

**I.    FACTUAL ALLEGATIONS**[1]

The Amended Complaint names seven BCCF employees as Defendants—Sergeant Beck, Corrections Officer Rizzo, Corrections Officer Hickmond, Corrections Officer Dowdy, Deputy

---

[1] The following factual allegations are taken from Detty's Amended Complaint (ECF No. 13).

Warden Reid, Sergeant Cruz, and Lieutenant Brown—as well as two nurses employed by PrimeCare identified only as Jane Doe-1 and Jane Doe-2.[2]  (Am. Compl. at 1, 9, 11.)  As before, Detty raises claims pertaining to assorted conditions in which he was confined at BCCF that can be grouped into two sets of events.  First, Detty brings claims related to an explosion on his unit and how certain Defendants handled his medical care in the aftermath.  Second, Detty brings claims related to two separate occasions when other inmates flooded the unit on which he was housed with toilet water.

### A.  The Explosion and Related Events

The events giving rise to Detty's first set of claims began on December 14, 2022, when Detty noticed a "foul smell" on his unit that worsened throughout the afternoon, causing his eyes to burn, his chest to hurt, his tongue to tingle, his heart to beat faster, a headache, and incessant coughing.  (Am. Compl. at 2, ¶¶ 1-2, ¶ 4.)  At approximately 5:00 p.m., Detty observed non-defendant Officer Swan sniff around the day room before going to his desk to make a phone call.  (*Id.* at 2, ¶¶ 3-4.)  Approximately fifteen minutes later, Defendant Sergeant Beck spoke with Officer Swan, shut off the television in the day room, and told the approximately thirty inmates in the room "to listen up somethings on fire and burning I want everyone to go upstairs and lock in until I find out what's going on."  (*Id.* at 2, ¶ 5.)  At the time, Detty was locked into his cell on the bottom tier of the unit because "due to a lack of guards, only one tier could be out of their cell at a time."  (*Id.* at 2, ¶ 3.)  As Beck made his way upstairs to investigate the smell, Detty

---

[2] These are the same Defendants who were named in Detty's initial Complaint.  The titles of some of these Defendants are slightly inconsistent throughout the Amended Complaint, but the differences are not relevant for purposes of this Memorandum.

"began kicking the door and yelling 'I can't breath[e]!'" but Beck ignored Detty and continued up the stairs.  (*Id.* at 3, ¶ 6.)

A few minutes later, Detty overheard Beck asking an inmate named Tyler Perkins about the smell, and heard Perkins tell Beck that his tablet "got hot and started smoking so I wrapped it up in my tee-shirt, it's now on my bed."  (*Id.* at 3, ¶ 7.)  Beck then allegedly threw the tablet in Perkins's toilet, which resulted in an explosion that caused "toxic deadly lithium fumes" to travel into Detty's cell from the vent in Perkins's cell.  (*Id.* at 3, ¶ 8.)  Detty got up on his toilet and yelled for Beck to "open cell C-4 because I can't see or breath[e]."  (*Id.* at 3, ¶ 9.)  Beck did not respond to Detty but rather, yelled to Officer Swan "Open up the top tier!"  (*Id.*)  Detty, still in his cell experiencing symptoms from the smoke and kicking his door, could hear Beck saying "Listen up, I want everyone to go to the Gym, now lets go, move it!" and saw inmates moving toward the gym.  (*Id.* at 3, ¶ 10.)  Thereafter Detty heard Beck yell to Swan, "Open the bottom [tier]!"  (*Id.* at 3, ¶ 11.)  At that point Detty, who was one of the last inmates to exit, "came out coughing" and asked Beck to go "to the Dispensary for treatment," to which Beck responded "No, go to the Gym!"  (*Id.*)  The Amended Complaint is not entirely clear on how long it took to evacuate Detty following the explosion, but it was least ten minutes.  (*See id.* at 3, ¶ 10.)

Detty proceeded to the gym, which also smelled of the toxic fumes; his eyes were swelling his head was pounding.  (*Id.* at 3, ¶ 12.)  He told a guard that he thought he was going to throw up and the guard told him that he could go to the dispensary following a "count" along with two other people who needed medical attention.  (*Id.*)  Nurses arrived at the gym before count was over, one of whom checked Detty's vital signs and told him he would be "going to the Dispensary after the Count is done" and to "hold on."  (*Id.* at 3, ¶ 13.)  At some point thereafter, Detty was taken to the dispensary, where he vomited all over the bathroom.  (*Id.*

at 4, ¶ 14.)  After discussing his condition with a nurse, Detty was transported to a local hospital. (*Id.* at 4, ¶¶ 16-17.)

At the hospital, Detty was treated by a nurse named Monica.  (*Id.* at 4, ¶ 18.)  Detty told Monica that he had been exposed to toxic fumes, that he is "on Chronic Care" due to an allergic condition, that he had not had anything to eat, and that he "was on a Bland Diet because [he] could not eat certain foods" as reflected on an armband issued to him by BCCF.  (*Id.* at 4, ¶ 19.) Monica gave Detty two packages of graham crackers and explained to the officers who were present that it is important for Detty to eat as soon as he returns to BCCF.  (*Id.* at 4, ¶¶ 20-21.) Monica also told the officers that if Detty threw up after he ate, she wanted him to return to the hospital for "further tests" that could not be performed at BCCF.  (*Id.* at 4, ¶ 22.)

Detty was fed upon his return to BCCF and then escorted back to the dispensary, where an officer told Defendant Nurse Jane Doe 1 about Monica's instruction to return Detty to the hospital if he threw up after eating.  (*Id.* at 5, ¶¶ 23-24.)  Jane Doe 1 gave Detty a pill for his stomach, told him he "look[ed] fine" even though he complained that his eyes were still burning and he still had a headache, and sent him back to his cell block.  (*Id.* at 5, ¶ 25.)  When he returned to his cell, Detty could still smell fumes lingering on his clothes and sheets, and he began to throw up.  (*Id.* at 5, ¶¶ 26-27.)  He alerted an officer and was returned to the dispensary, where Jane Doe 1 refused to send him back to the hospital despite being reminded of Monica's discharge instruction, stating that he "look[ed] fine."  (*Id.* at ¶ 27.)

Detty returned to his cell and went to the "Chow Hall" at 7:00 a.m. the next morning after a sleepless night.  (*Id.* ¶ 30.)  Shortly after returning to his cell, he was taken to the dispensary,[3]

---

[3] In his initial Complaint, Detty alleged that Jane Doe 1 told him that she would have someone check on him in the morning.  (*See* Compl. at 5, ¶ 38.)  That appears to be the reason he was returned to the dispensary.

where he began throwing up again and asked to be sent back to the hospital.  (*Id.* ¶ 31.)  Nurse

Jane Doe 2 asked Detty what was wrong, and he told her that he "has been throwing up for the

past 16 hours or so, before and after going to the Hospital due to the explosion."  (*Id.* at 6, ¶ 33.)

Detty asked to be sent back to the hospital, but Jane Doe declined to send him back, saying, "I'm

your Nurse, I say what goes on, [you're] in Prison and I call the shots around here," and "you

look fine to me!" (*Id.* at 6 ¶ 34.)

Thereafter, Officer Rizzo, who had been called to the Dispensary to clean up Detty's

vomit, gave Detty a pair of latex gloves and told him, "clean up your mess!"  (*Id.* at 6 ¶ 37.)

Detty responded that he was sick "and unable to do so," to which Rizzo replied, "This is your

job, you work for Sanitation don't you?" and "I will call the Lt. over and tell him to give you a

Misconduct for Disobeying a Direct Order, and you can go to the RHU." (*Id.*).  So, Detty

cleaned the vomit.  (*Id.*)

Detty returned to his cell but, shortly thereafter, was directed to pack his belongings

because he would be going to the RHU "per order of Jane Doe-2."  (*Id.* at 6, ¶ 38.)  Defendant

Officer Hickmond escorted Detty to the RHU and placed him in a holding cell.  (*Id.* at 6, ¶ 39.)

Detty reminded Hickmond that he still needed to be fed and showed Hickmond his "Special Diet

Wristband." (*Id.*)  Hickmond assured Detty that he would be fed but when he returned to

retrieve Detty from the holding cell to take him to the RHU, stated that he forgot the tray and

would "tell the Block Officer to call [Detty] for his meal."  (*Id.* at 6, ¶ 40.)

Upon arrival at the RHU cell block, Hickmond asked Defendant Officer Dowdy to get

Detty a bland diet tray.  (*Id.* at 6, ¶ 41.)  Dowdy responded that lunch was over, so Detty would

have to wait for dinner, and directed Detty to go to his cell.  (*Id.*)  Detty's cell in the RHU had

"human feces smeared all over the walls and floor" and the sink was clogged, such that only

toilet water was available.  (*Id.* at 7 ¶ 42.)  Detty asked Dowdy to address these issues, but Dowdy did not do so.  (*Id.* at 7, ¶ 43.)  Detty also asked Dowdy to add his name to the special diet list to reflect that he could only eat "Bland Diet Trays" because of his allergies and showed Dowdy his wrist band to that effect.  (*Id.* at 7, ¶ 44.)

Dowdy directed Detty to return to his cell, where Detty was housed for approximately six days from December 15, 2022 at 1:30 p.m. until December 20 or 21, 2022.  (*Id.* at 7, ¶ 43.)  He was initially kept on lock down for the first three shifts, during which he was not permitted to leave his cell unless nurses were checking his vitals.  (*Id.* at 7, ¶¶ 43, 45.)  After three days, he "found out from a Nurse" that he lost three to six pounds, which he attributes to the fact that he had not been receiving his bland diet trays of food and "had been throwing up constantly."  (*Id.* at 7, ¶ 46.)  He began to put in daily requests to have his sink fixed, to be given showers, and for unspecified medical care.  (*Id.*)  After six days in these conditions,[4] Detty spoke with non-defendant Lieutenant Thomas, whom it appears arranged for Detty to receive a bland diet tray (the first since he arrived in the RHU) and to go to the dispensary.  (*Id.* at 7, ¶¶ 48-50.)  He was then released from the RHU and returned to C-Block, where he received a shower, and "went back to the normal Prison Routine."  (*Id.* at 7, ¶¶ 51-52.)

A few days later, Nurse Jane Doe 2 visited Detty's cell to ask him to sign a paper for blood work, which Detty initially refused to sign, saying that he "needed Blood Work on December 15, 2022."  (*Id.* at 8, ¶¶ 53-54.)  He reluctantly signed, however, after Jane Doe 2 responded that he would go to the RHU if he did not do so.  (*Id.* at 8, ¶ 55.)  Detty alleges that

---

[4] Although unclear, Detty may also be claiming that he was denied recreation during the six days that he spent in the RHU.  (Am. Compl. at 10, ¶ 78.)

"things went well" thereafter until he experienced flooding from toilets on the unit as discussed further below.  (*Id.* at 8, ¶ 56.)

### B.  Flooding on the Unit

The Amended Complaint, like the initial Complaint, brings claims based on two occasions when Detty's housing unit was flooded with toilet water.  On January 17, 2023, Detty awoke to a "very loud noise, along with a foul smell," and saw that human feces were "flowing from [the] toilet in dark grey water."  (*Id.* at 8, ¶ 56.)  Detty alleges that he had to get up and walk in the water, which was above his ankles.  (*Id.*)

Defendant Sergeant Cruz responded to the flood and asked some of the inmates, including Detty, to clean the block for $5.00.  (*Id.* at 8, ¶ 57.)  Detty told Cruz that he worked for sanitation and "could run the 40 G[a]llon Zambonie Machine, after being equipped with Gloves, Masks, and Boots which is required when dealing with Toxic Waste."  (*Id.* at 8, ¶ 58.)  Cruz sent officers to get the equipment, and Detty and others began cleaning.  (*Id.* at 8, ¶ 59.)  However, Cruz never supplied masks or gloves.  (*Id.*)  Cruz also directed Detty to dump the 40 gallons of waste down a drain in the yard, which Detty did even though those drains were not to be used for waste.  (*Id.* at 8, ¶ 60.)

After five hours of work, Detty asked Cruz if he could go to the Dispensary "to get his eyes flushed out" because his eyes were burning and he had a headache.  (*Id.* at 8, ¶ 62.)  It is unclear how Cruz responded.  After working for a total of seven hours, Detty and the other inmates signed paperwork to receive payment for their work and were locked into their cells to be fed.  (*Id.* at 8, ¶ 9.)  Detty asked Cruz whether they had to eat among "all this toxic waste."

(*Id.* at 9, ¶ 63.)  It is unclear what the condition of the unit was at that time (since it had been cleaned for the past seven hours) or how Cruz responded.[5]

The next incident occurred on February 2, 2023, when two inmates flooded Detty's unit, causing water with feces in it to flow out of his toilet and throughout his cell.  (*Id.* at 9, ¶¶ 68-69.)  Detty began to kick his cell door so that he "could be free from standing in human waste." (*Id.* at 9, ¶ 70.)  Brown arrived at the cell and, upon seeing the waste, directed Detty and his cellmate to the day room.  (*Id.* at 9, ¶ 71.)  Detty told Brown that they "used the Zamboni and three Vacs" to clean up the prior flood, to which Brown responded, "here's some mops, squees, and broom that I want you to use to push it all outside in the Yard Drain."  (*Id.* at 9, ¶ 72.)  Detty asked Brown to supply gloves and paper masks, but Brown did not do so, although he said that he would order them hot meals once they were done.  (*Id.* at 9, ¶ 73.)  After working for approximately two hours, Detty asked Brown for a mask because his head was pounding, but Brown did not provide one.  (*Id.* at 10, ¶ 74; *see also id.* at 9, ¶ 72.)  Detty and the other inmates were provided food at about 12:30 a.m., following at least five hours of work, but Detty claims that the block "was not completely sanitized" and that they were required to eat among the "waste that was in [their] cells."  (*Id.* at 10, ¶ 74.)

Brown then told the inmates that he was shutting off the water on the block to prevent further floods.  (*Id.* at 10, ¶ 76.)  This affected forty-five cells, and the inmates housed in those cells, including Detty, had no running water and could not flush their toilets.  (*Id.* at 10, ¶ 81.)  Detty claims that his headache began to get worse from fumes and that his eyes were red because he could not stop rubbing them.  (*Id.*)  After sixty-six hours, a correctional officer flushed

---

[5] Detty also describes some events that happened the next day, (Am. Compl. at 9, ¶¶ 64-67), but none of these allegations pertain to any of the Defendants and, accordingly, do not support a claim against any of them.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998).

Detty's toilet for him, and another officer flushed his toilet again twenty-two hours after that.
(*Id.* at 10, ¶¶ 83-84.)  The shut off lasted for a total of five days.  (*Id.* at 10, ¶ 84.)

### C.  Detty's Claims

Detty brings claims for deliberate indifference to his health, safety, and medical needs
based on the above events.  (*Id.* at 11-12, ¶¶ 93-95, ¶ 97.)  Detty also brings a due process claim
based on allegations that Deputy Warden Reid ignored his grievances and an "inmate request"
that he sent to her.  (*Id.* at 10-11, ¶¶ 85-87; *id.* at 12, ¶ 96.)  He seeks damages.[6]  (*Id.* at 12-13.)

## II.    STANDARD OF REVIEW

Since Detty is proceeding *in forma pauperis*, 28 U.S.C. § 1915(e)(2)(B)(ii) requires the
Court to dismiss the Amended Complaint if it fails to state a claim.  Whether a complaint fails to
state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to
dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d
236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains
"sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted); *Talley v. Wetzel*, 15 F.4th 275,
286 n.7 (3d Cir. 2021).  "At this early stage of the litigation,' '[the Court will] accept the facts
alleged in [the *pro se*] complaint as true,' 'draw[] all reasonable inferences in [the plaintiff's]
favor,' and 'ask only whether [that] complaint, liberally construed, . . . contains facts sufficient to

---

[6] Detty also seeks a declaration that his rights have been violated.  (Am. Compl. at 12.)  Since
declaratory relief is unavailable to adjudicate past conduct, Detty's request for this declaratory
relief is improper.  *See Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (*per curiam*)
("Declaratory judgment is inappropriate solely to adjudicate past conduct" and is also not "meant
simply to proclaim that one party is liable to another."); *see also Andela v. Admin. Office of U.S.
Courts*, 569 F. App'x 80, 83 (3d Cir. 2014) (*per curiam*) ("Declaratory judgments are meant to
define the legal rights and obligations of the parties in the anticipation of some future conduct.").

state a plausible [] claim.'"  *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (quoting

*Perez v. Fenoglio*, 792 F.3d 768, 774, 782 (7th Cir. 2015)), *abrogation on other grounds*

*recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024).  Conclusory allegations do

not suffice.  *Iqbal*, 556 U.S. at 678.  As Detty is proceeding *pro se*, the Court construes his

allegations liberally.  *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay*

*Marina, Inc*., 704 F.3d 239, 244-45 (3d Cir. 2013)).

## III.    DISCUSSION

Detty asserts his constitutional claims pursuant to § 1983, the statute enabling a plaintiff

to raise claims for violations of the federal constitution.  "To state a claim under § 1983, a

plaintiff must allege the violation of a right secured by the Constitution and laws of the United

States, and must show that the alleged deprivation was committed by a person acting under color

of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  Since Detty was a pretrial detainee at the

time of the events in question, the Fourteenth Amendment, rather than the Eighth Amendment,

governs his conditions-of-confinement claims.  *See Hubbard v. Taylor*, 399 F.3d 150, 165-66 (3d

Cir. 2005).

Prison officials have a constitutional duty to provide humane conditions of confinement,

including adequate food, clothing, shelter, and medical care, and must take reasonable measures

to guarantee the safety of the inmates.  *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)

(internal quotation and citation omitted).  To establish a basis for a Fourteenth Amendment

violation, a pretrial detainee must allege that his conditions of confinement amount to

punishment.  *Bell v. Wolfish*, 441 U.S. 520, 538 (1979); *Camps v. Giorla*, 843 F. App' x 450, 452

(3d Cir. 2021) (*per curiam*) ("[A] court must determine whether the conditions complained of

were imposed for the purpose of punishment or whether it is merely incidental to a legitimate

governmental objective."). "Unconstitutional punishment typically includes both objective and subjective components." *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007). "[T]he objective component requires an inquiry into whether the deprivation was sufficiently serious and the subjective component asks whether the officials acted with a sufficiently culpable state of mind." *Id.* (internal quotations and alterations omitted). To satisfy the subjective component of the analysis, a prisoner generally must assert that prison officials acted with deliberate indifference, meaning that they consciously disregarded a serious risk to the detainee's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991); *see Edwards v. Northampton Cnty.*, 663 F. App'x 132, 135 (3d Cir. 2016) (*per curiam*) ("[W]e agree with the District Court and find no reason to apply a different standard here as we have applied the 'deliberate indifference' standard both in cases involving prisoners and pretrial detainees." (internal citations omitted)).

When medical treatment is at issue, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs. *See Farmer*, 511 U.S. at 835. "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted). Deliberate indifference in this context is properly alleged "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).

Further, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, 'federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.'" *Davis v. Superintendent Somerset SCI*, 597 F. App'x 42, 45 (3d Cir. 2015) (*per curiam*) (quoting *United States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).

To establish individual liability in a § 1983 action, the personal involvement of each defendant in the alleged constitutional violation is a required element, meaning a plaintiff must allege how each defendant was involved in the events and occurrences giving rise to the claims brought against that defendant.[7] *See Rode*, 845 F.2d at 1207.  In other words, "'[e]ach Government official, his or her title notwithstanding, is only liable for his or her *own* misconduct.'" *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018)  (quoting *Iqbal*, 556 U.S. at 677) (emphasis in original).

---

[7] Detty sued Defendants Reid and Brown in their official capacities, as well as their individual capacities.  (Am. Compl. at 11, ¶¶ 87 & 92.)  As the Court previously instructed Detty, official capacity claims against a defendant are indistinguishable from claims against the entity that employs the defendant.  *Detty*, 2025 WL 77080, at *7 n.15 (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n. 55 (1978)).  In other words, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," here, Bucks County. *Id.*  To state a claim against a municipality, a plaintiff must allege that the municipality's policy or custom caused the violation of his constitutional rights.  *See Monell*, 436 U.S. at 694.  "To satisfy the pleading standard, [the plaintiff] must . . . specify what exactly that custom or policy was."  *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009).  As with the initial Complaint, the Amended Complaint fails to adequately plead that the alleged constitutional violations at issue derived from a policy or custom of Bucks County.  At most, Detty has again included only a few conclusory phrases on this point.  (Am. Compl. at 12, ¶¶ 94 & 97).  Having previously provided Detty with the standards governing official capacity claims, the Court will dismiss any official capacity claims in the Amended Complaint with prejudice.  *See Jones v. Unknown D.O.C. Bus Driver & Transp. Crew*, 944 F.3d 478, 483 (3d Cir. 2019) (amendment by pro se litigant would be futile when litigant "already had two chances to tell his story").

12

"Suits against high-level government officials must satisfy the general requirements for supervisory liability." *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017). There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015). First, a supervisor may be liable if he or she "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)). A supervisor may also "be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Id.* "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Rode*, 845 F.2d at 1207.

## A. Sergeant Beck

Detty brings deliberate indifference claims against Sergeant Beck based on how he handled the situation with the burning tablet, and for delaying or denying medical treatment for injuries Detty sustained from being exposed to the fumes. (Am. Compl. at 2-4, ¶¶ 5-22; *id.* at 11, ¶ 93.) Courts have held that an inmate's Fourteenth Amendment rights are implicated if ventilation is inadequate to the point that it undermines health and/or sanitation. *See Brown v. Smith*, No. 23-780, 2024 WL 4094279, at *6 (E.D. Pa. Sept. 5, 2024) (citing cases); *see also Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) ("Inadequate ventilation and air flow violates the Eighth Amendment if it undermines the health of inmates and the sanitation of the penitentiary." (internal quotations omitted)); *Perry v. Well-Path*, No. 20-2542, 2020 WL

4015241, at *4 (E.D. Pa. July 16, 2020) (explaining that a claim based on exposure to fumes "contains an objective component . . . that the prisoner be subjected to an unreasonably high level of contamination, and a subjective component, that the prison authorities were deliberately indifferent.").  Similarly, the Fourteenth Amendment is violated if a defendant delays or denies care for an inmate's serious medical needs caused by exposure to fumes.  *See Metz v. Tinde*, No. 11-01249, 2011 WL 5245440, at *2 (D. Nev. Nov. 1, 2011) (concluding that plaintiff stated a constitutional claim "based on his allegations that he was subjected carbon monoxide fumes that caused him to have chest pains, headaches, dizziness, shortness of breath, skin irritation, and vomiting" and "based on inadequate medical care for his ailments resulting from the generator fumes"); *see also Perry*, 2020 WL 4015241, at *4.

The facts alleged by Detty do not support a deliberate indifference claim against Beck. According to the Amended Complaint, the fumes were initially caused by an inmate who wrapped his tablet in a t-shirt when it got hot, and Beck exacerbated the fumes when he threw the tablet in the toilet in the process of investigating the incident.  The Amended Complaint, like the initial Complaint, does not contain any allegations supporting a plausible inference that Beck's behavior was motivated by deliberate indifference, as opposed to negligence or a good faith effort to investigate the smell, handle the matter of the burning tablet, and/or evacuate the unit following the explosion.  Detty alleges that Beck ignored him on his way up the stairs, but it is apparent that Beck's priority at that time was to investigate the source of the worsening foul smell impacting the entire unit.  Even considering the physical symptoms Detty was experiencing and reading Detty's allegations in the most favorable light, the Amended Complaint does not reflect that he required more immediate treatment than he received considering the totality of the circumstances, including the need for Beck to evacuate the unit to

14

ensure all inmates were safe.  Although Detty was in his cell breathing the fumes for at least ten minutes after the explosion, the Amended Complaint reflects that Beck evacuated the top tier first (where the explosion had occurred) and then, once the top tier was evacuated, directed evacuation of the bottom tier.  Notably, the tiers previously had not been permitted out at the same time due to limited staffing, so Beck was working under those conditions while evacuating a unit where an explosion had occurred and during which more than one inmate (Detty included) needed medical care.  In light of these facts, Detty fails to allege plausibly that Beck's response to him during the evacuation constituted deliberate indifference.  It is also important to note that, per Detty's own allegations, nurses performed an initial evaluation of Detty at the gym before count was completed and that he was then taken to the dispensary and the hospital for treatment following his exposure to the fumes.  Under these circumstances, Detty has not alleged any plausible basis for concluding that Beck acted with deliberate indifference to his health or safety.  *See Palacios v. Corr. Officer Lamb*, No. 96-2472, 1997 WL 43217, at *2 (N.D. Ill. Jan. 27, 1997) (noting the difference between a correctional officer's failure to "arrive at [the prisoner's] gallery within a reasonable time simply because he was not where he was supposed to be," which would not be "cruel and unusual punishment because he was not intending to injure the prisoners" and allegations that "support an inference that [the officer] wanted the prisoners to suffer from the smoke and intentionally delayed releasing them from their cells"); *see also Butler v. Wetzel*, No. 23-00859, 2024 WL 4774889, at *6 (M.D. Pa. Nov. 13, 2024) ("Butler's subjective belief that the evacuation of the housing unit did not occur fast enough (even though he admits it took only '12 to 15' minutes, including initial time spent attempting to extinguish the fire) simply does not amount to a plausible allegation of deliberate indifference to a substantial risk to prisoner health or safety.").

15

### B. Nurses Jane Doe-1 and Jane Doe-2

Detty claims that Nurses Jane Doe-1 and Jane Doe-2 acted with deliberate indifference to his serious medical needs because they did not send him back to the hospital after he vomited and denied him "proper medical care." (Am. Compl. at 5-6, ¶¶ 23-35; *id.* at 12, ¶¶ 94-95.) "Vomiting, in and of itself, is not an uncommon result of being mildly ill, and, absent other circumstances (e.g., vomiting continuously for a long period of time, having blood in one's vomit, or the like), does not amount to an objectively serious medical condition." *Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010); *see also Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1030 (10th Cir. 2020) (concluding that frequent vomiting, without the presence of blood, did not constitute a serious medical need); *Maier v. Lehman*, No. 13-6669, 2014 WL 7182116, at *8 (E.D. Pa. Dec. 16, 2014) (citing cases to conclude that vomiting does not rise to the level of a serious medical need); *see also Flynn v. Dep't of Corr.*, No. 12-1535, 2021 WL 134206, at *13 (M.D. Pa. Jan. 14, 2021) (same). Whether a plaintiff pleads a serious medical need in connection with vomiting depends on the totality of the circumstances in a given case. *See Crawford v. Corizon Health, Inc.*, No. 17-00113, 2018 WL 9965506, at *3 (W.D. Pa. Jan. 2, 2018) (observing that allegations have been found "sufficient to plead deliberate indifference where it was alleged that: prison staff intentionally ignored the plaintiff's complaints of an inability to breath and discharge from her lungs on multiple occasions; when the plaintiff presented with nausea, vomiting, aches, fever, and sleeplessness, they treated her for influenza (without any medical testing); and, when the treatment did not meaningfully address her symptoms, medical staff took note of her inability to breathe hours before the plaintiff was admitted to the Intensive Care Unit and diagnosed with bacterial pneumonia, which led to her death" (citing *Shultz v. Allegheny Cnty.*, 835 F. Supp. 2d 14 (W.D. Pa.)); *cf. Atkinson v. Taylor*,

316 F.3d 257, 266 (3d Cir. 2003) (recognizing case law holding that "headaches, dizziness, nausea, vomiting, and breathing difficulties stemming from exposure to [environmental tobacco smoke] constituted a serious medical need").

Detty first saw Jane Doe-1 on the night that he returned from the hospital, when she gave him a pill for his stomach, told him he "look[ed] fine" (even though he complained that his eyes were still burning and he still had a headache) and sent him back to his cell block.  (Am. Compl. at 5, ¶¶ 23-25.)  He saw Jane Doe-1 a second time that evening when he returned to the dispensary after the lingering smells on his clothes and sheets caused him to vomit, but she refused to send him back to the hospital—despite being reminded of Monica's instruction that he should return if he vomited after eating—stating that he "look[ed] fine."  (*Id.* at 5, ¶¶ 26-27.) Detty saw Nurse Jane Doe-2 early the next morning when he was taken back to the dispensary after he had been to Chow Hall and threw up again in the dispensary bathroom.  Like Jane Doe-1, Jane Doe-2 did not send Detty back to the hospital at his request "for further tests and[] after expressing his fear for his health and safety."  (*Id*. at 6, ¶ 34.)

Assuming that Detty's medical needs were serious given his allegations about exposure to the fumes, his symptoms, and his hospital visit, he has not plausibly alleged that Jane Doe-1 and Jane Doe-2 acted with deliberate indifference to those serious medical needs.  At the time these nurses saw Detty, he had already received treatment at the hospital for his exposure to the fumes, so he had (presumably) received whatever care was necessary to stabilize him for discharge and return to BCCF.[8]  Additionally, Jane Doe-1 provided Detty with a pill for his stomach on the evening that he returned from the hospital.

---

[8] The Amended Complaint does not allege otherwise.

The thrust of Detty's claim is that these nurses did not return him to the hospital for further tests in accordance with what the discharge nurse had instructed even though he had thrown up at least twice in the sixteen hours since he arrived back at BCCF. Notably, however, the Amended Complaint provides no information on how (if at all) Detty was diagnosed at the hospital, what (if anything) medical concern was if he were to continue to vomit, and what additional tests or treatments would have been medically indicated at the time he interacted with Jane Doe-1 or Jane Doe-2. It is not apparent from the facts alleged that these nurses' decision to monitor Detty within the twenty-four hours after he had returned from the hospital, rather than return him to the hospital, rises to the level of deliberate indifference.[9] In other words, even if Jane Doe-1 and Jane Doe-2 could have taken another approach to Detty's care, the Amended Complaint does not support an inference that they disregarded a major health risk by continuing to monitor his symptoms to see how his condition progressed instead of returning him to the hospital—where he had been less than twenty-four hours ago—for unspecified tests. Additionally, the Amended Complaint suggests Detty's symptoms from the exposure to fumes resolved without the need for additional medical tests at the hospital. The Court will therefore dismiss Detty's claims against Jane Doe-1 and Jane Doe-2. *See Sylvester v. City of Newark*, 120 F. App'x 419, 424 (3d Cir. 2005) ("[T]o the extent that appellants argue that the medical professionals should have done more, or done it differently, or done it better, that is not deliberate indifference"); *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("While the distinction between deliberate indifference and malpractice can be subtle, it is well

---

[9] In his initial Complaint, Detty explained that Nurse Jane Doe-2 placed in him the RHU for "24 hour Lock-In/Medical Watch." (Compl. at 7, ¶ 54.) This is consistent with Detty's allegations in the Amended Complaint that while he was in the RHU, nurses were taking his vitals at various intervals.

established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."); *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) ("If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a *doctor* disagrees with the professional judgment of another doctor.  There may, for example, be several acceptable ways to treat an illness.").

### C.  Officer Rizzo

The only factual allegations supporting a claim against Officer Rizzo are based on Rizzo requiring Detty to clean his vomit when he still did not feel well.  (Am. Compl. at 6, ¶¶ 36-39; *id.* at 11, ¶ 93.)  This incident occurred the morning after Detty returned from the hospital, following Detty's discussion with Jane Doe-2 after she declined send him back to the hospital.  (*Id.* at 6, ¶ 36 (noting that Detty saw Rizzo after he "left the back room" in the dispensary).)  "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with . . . deliberate indifference."  *Spruill*, 372 F.3d at 236.  The Court cannot conclude, even under a liberal reading of the Amended Complaint, that Detty has plausibly alleged Rizzo acted with deliberate indifference to Detty's health or safety by making him clean his vomit since Detty had just been seen by a medical professional and was, at that time, apparently cleared to return to his unit.  Further, as in his initial Complaint, Detty "does not allege that Rizzo interfered with his ability to get medical care or meaningfully worsened his health condition."  *Detty*, 2025 WL 77080, at *9.  In other words, the Amended Complaint does not support an inference that Rizzo disregarded a risk to Detty's health that was "excessive" or caused any harm to Detty other than, perhaps, some additional discomfort by directing him to do a task when he did not feel well.  *See*

*Corbin v. Halligan*, No. 18-0186, 2021 WL 7161976, at *4 (W.D. Pa. Nov. 15, 2021)

(recommending dismissal of claim based on allegations that "Defendants could have done more

to accommodate or reduce the discomfort associated with his injury"), *report and*

*recommendation adopted*, 2022 WL 34625 (W.D. Pa. Jan. 4, 2022).  Accordingly, Detty has not

stated a plausible deliberate indifference claim against Rizzo based on this interaction.

### D.  Claims Against Officers Hickmond

The only factual basis for a claim against Officer Hickmond, *i.e.*, the only events in

which he was personally involved, relate to Hickmond's failure to ensure that Detty received

lunch on the afternoon when he was transported to the RHU by way of a holding cell, causing

Detty to miss a meal.  (Am. Compl. at 6-7, ¶¶ 39-41.)  "[P]risoners are entitled to a nutritionally

adequate diet," *Tapp v. Proto*, 718 F. Supp. 2d 598, 621 (E.D. Pa. 2010), *aff'd*, 404 F. App'x 563

(3d Cir. 2010), "includ[ing] . . . a medically appropriate diet when necessary."  *Scinto v.*

*Stansberry*, 841 F.3d 219, 233 (4th Cir. 2016) (citing cases).  Whether the deprivation of food is

objectively serious for purposes of establishing a constitutional violation "depends on the amount

and duration of the deprivation."  *Duran v. Merline*, 923 F. Supp. 2d 702, 720 (D.N.J. 2013)

(internal quotations omitted).

Hickmond is alleged to have caused Detty to miss lunch on the afternoon he was

transported to the RHU.  Missing one meal, however, is not an objectively serious deprivation

that rises to the level of a constitutional violation.  *Compare Lindsey v. O'Connor*, 327 F. App'x

319, 321 (3d Cir. 2009) (*per curiam*) ("The purported deprivation of a single meal is not of such

magnitude as to rise to the level of a constitutional violation"); *Adderly v. Harry*, No. 13-1465,

2015 WL 5016501, at *4 (M.D. Pa. Aug. 21, 2015) (concluding that deprivation of lunch one

day and breakfast and lunch the following day failed to state an Eighth Amendment claim) *with*

*Cooper v. Sheriff, Lubbock Cnty., Tex.*, 929 F.2d 1078, 1081, 1083 (5th Cir. 1991) (finding that failure to feed a prisoner for twelve consecutive days violated the Eighth Amendment). Further, the Amended Complaint does not support an inference that Hickmond acted with deliberate indifference. To the contrary, Detty alleged that Hickmond initially told Detty he would be provided lunch and, when he returned to retrieve Detty from the holding cell, acknowledged his oversight and sought to correct it when they reached the RHU (even though he was unable to do so). These facts are more consistent with negligence than deliberate indifference. Accordingly, Detty has not stated a claim against Officer Hickmond.[10]

### E. Claims Against Officer Dowdy

Detty's claims against Defendant Dowdy pertain to the conditions in which Dowdy was kept in the RHU for approximately six days, specifically, he was housed in a cell with human feces smeared on the floor and walls and in which there was no running water apart from the toilet, without access to a shower, during which time he was "throwing up constantly" and did not receive food accommodating his need for a bland diet. (Am. Compl. at 7, ¶¶ 42-51; *id.* at 11, ¶ 93.) Detty alleges that he addressed these issues with Dowdy upon his arrival to the RHU, but Dowdy did not take any action to resolve them. (*Id.* at 7, ¶¶ 42-44.)

"In determining whether the conditions of confinement amount to a constitutional violation, the circumstances, nature, and duration of the conditions must be carefully considered but the length of exposure is often of prime importance." *Martin v. Gearhart*, 712 F. App'x 179, 186 (3d Cir. 2017) (*per curiam*) (cleaned up) (quoting *DeSpain v. Uphoff*, 264 F.3d 965, 974

---

[10] Detty has not alleged any other basis for a claim against Hickmond, including any claim for deliberate indifference to medical needs. (*See* Am. Compl. at 11, ¶ 93.) Nothing in the Amended Complaint suggests that Detty required any medical attention during the limited time he spent with Hickmond when he was being transported to the holding cell and then to the RHU.

(10th Cir. 2001)).  Since "exposure to human waste carries particular weight in the conditions

calculus," *id.* at 187 (quoting *DeSpain*, 264 F.3d at 974), even relatively short exposures to

human waste have been found to violate the constitution.  *See DeSpain*, 264 F.3d at 974

("Exposure to human waste, like few other conditions of confinement, evokes both the health

concerns emphasized in *Farmer* and the more general standards of dignity embodied in the

Eighth Amendment." (citing cases)).  "[I]n determining whether conditions of confinement

violate the [constitution] we must look at the totality of the conditions within the institution."

*Tillery v. Owens*, 907 F.2d 418, 426 (3d Cir. 1990); *see also Hope v. Warden York Cnty. Prison*,

972 F.3d 310, 326 (3d Cir. 2020) (in assessing whether conditions amount to unconstitutional

punishment of detainees, courts "consider the totality of the circumstances of confinement,

including any genuine privations or hardship over an extended period of time").

Viewing the alleged conditions in the RHU as a whole, Detty has stated an objectively

serious deprivation for purposes of screening.  He alleges that, at a time when he was regularly

vomiting, he was housed for six days in a cell smeared with human feces, without any running

water, or an opportunity to clean himself, and that he was denied meals accommodating his diet.

He also alleges that, between the lack of food and vomiting, he lost between three and six

pounds.  As alleged, these conditions are objectively serious.  *See Thomas v. Blackard*, 2 F.4th

716, 720-21 (7th Cir. 2021) ("Thomas's assertions of feces-covered walls, a lack of hot water,

hundreds of dead flies in his bed, and a mattress covered in human waste no doubt establish a

material dispute on the objective prong of an Eighth Amendment claim."); *McKeithan v. Beard*,

322 F. App'x 194, 202 (3d Cir. 2009) (*per curiam*) ("[P]risoners placing feces in the air vents,

flooding 'the tier' with feces, and banging on the doors and sinks for days on end."); *McBride v.*

*Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001) ("Given the totality of the circumstances—i.e., the

three-day period and the proximity of human waste—we hold that Mr. McBride alleged

sufficient facts to demonstrate a sufficiently serious condition of confinement.").  Detty's

allegations, liberally construed, also support an inference of deliberate indifference against

Dowdy, who worked on the unit, because Dowdy allegedly declined to address Detty's concerns

after being made aware of them.  *See Vinning-El v. Long*, 482 F.3d 923, 925 (7th Cir. 2007)

("Given the conditions Vinning–El describes—a floor covered with water, a broken toilet, feces

and blood smeared along the wall, and no mattress to sleep on—a reasonable jury could infer

that prison guards working in the vicinity necessarily would have known about the condition of

the segregation cells.").  Accordingly, Detty has alleged an adequate basis to proceed on his

deliberate indifference claim against Dowdy.[11]

### F.  Claims Against Sergeant Cruz and Lieutenant Brown

Detty's claims against Sergeant Cruz and Lieutenant Brown are based on how these

Defendants responded on January 17, 2023, and February 2, 2023 respectively, when Detty was

made to clean toilet water with human waste that had flooded the unit for several hours.  (Am.

Compl. at 8-10.)  "Inmate exposure to sewage can constitute a serious risk to inmate health and

safety and satisfy the objective component" of a constitutional claim.  *Shannon v. Graves*, 257

F.3d 1164, 1168 (10th Cir. 2001); *see also Fruit v. Norris*, 905 F.2d 1147, 1150-51 (8th Cir.

1990) (observing that "'common sense' suggests that [prison officials] should have had

knowledge that unprotected contact with human waste could cause disease").  "At the same time,

---

[11] As with Hickmond, *supra* n.9, Detty has not alleged any other basis for a claim against
Dowdy, including any claim for deliberate indifference to medical needs.  (*See* Am. Compl. at
11, ¶ 93.)  Nothing in the Amended Complaint suggests that Dowdy delayed or denied medical
attention, and Detty's allegations that nurses regularly visited his cell in the RHU support an
inference that the correctional officers in the RHU would have had reason to believe he was
being treated for his condition.

the frequency and duration of the condition, as well as the measures employed to alleviate the condition, must be considered when considering the objective component." *Shannon*, 257 F.3d at 1168; *Wilson v. Bucks Cnty. Corr. Facility*, No. 23-0912, 2023 WL 2920834, at *3 (E.D. Pa. Apr. 12, 2023) ("[A] plaintiff must allege facts about the duration and extent of the deprivation to establish how a basic need was not met, and must allege how he was harmed by the unsanitary conditions."). As noted above, exposure to human waste raises concerns about health and sanitation so even relatively short exposures to human waste (relative to other conditions) have been found to violate the constitution. *See DeSpain*, 264 F.3d at 974 ("Exposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment." (citing cases)).

In contrast with the initial Complaint, the Amended Complaint alleges that on both occasions when the unit flooded, water containing fecal matter flooded Detty's cell, and he was made to clean the flood without protective gear such as gloves or a mask. He also alleges that neither Cruz nor Brown supplied protective gear for cleaning when requested. Detty was made to work in these conditions for five hours on the first occasion and seven hours on the second occasion and suffered physical affects in the form of headaches and eye irritation. These allegations, taken in Detty's favor, are sufficient to proceed against Cruz and Brown at this early stage of the litigation. *See Fruit*, 905 F.2d at 1151 ("We believe forcing inmates to work in a shower of human excrement without protective clothing and equipment would be inconsistent with any standard of decency." (internal quotations omitted)); *Thomas v. City of Philadelphia*, No. 21-0441, 2021 WL 1614411, at *5 (E.D. Pa. Apr. 23, 2021) (allowing claim to proceed where "taking the facts and reasonable inferences in the Amended Complaint as true, it is

24

reasonable to infer that Thomas was left in a multipurpose closet that was in some respect flooded with sewage water and then exposed directly to the sewage water from the housing unit when Doe directed him to clean it without gloves or cleaning supplies apart from towels, a mop, and toilet water."); *Banks v. Rozum*, No. 14 -27, 2015 WL 1186224, at *16 (W.D. Pa. Mar. 13, 2015) (discussing case law analyzing allegations that inmates were made to clean blood, feces, or other bodily fluids without protection), *aff'd*, 639 F. App'x 778 (3d Cir. 2016) (*per curiam*).

However, Detty has not stated a plausible claim against Brown based on his allegation that Brown shut off the water to the toilets for five days to prevent inmates from flooding the cells. The Amended Complaint reflects that because Brown shut off the water, Detty was not able to flush his toilet for sixty-six hours, when he received a first "flush" and that he then received a second flush twenty-two hours later, which "went on" until the water was turned back on. (Am. Compl. at 10, ¶¶ 83-84.) During these five days, Detty experienced headaches and had to smell the odors from the unflushed toilet. Although this was likely unpleasant, he has not alleged a constitutional violation. *See Horst v. Litz*, No. 23-00917, 2023 WL 4827077, at *3 (M.D. Pa. July 27, 2023) (allegations that plaintiff "must eat in his cell next to the toilet which leaks and doesn't always flush, that there is mold in the cell, that there is toothpaste on the walls, that no cleaning products are provided, and that he can smell sewage and other body smells" described conditions that were "undoubtedly uncomfortable," but did not constitute "a sufficiently serious deprivation (*i.e.*, a denial of one of life's necessities) such that [plaintiff] is facing a substantial risk of serious harm." (internal quotations and citation omitted)); *Scott v. Forrest Cnty.*, No. 19-123, 2022 WL 4088760, at *5 (S.D. Miss. Aug. 8, 2022) ("[T]o the extent that Plaintiff claims he was unable to flush his toilet for four to seven days due to a lack of running water, Plaintiff has not suffered a violation of his due process rights cognizable under §

1983."), *report and recommendation adopted,* 2022 WL 4088188 (S.D. Miss. Sept. 6, 2022); *Washington v. Wetzel*, No. 18-1390, 2022 WL 1782509, at *10 (W.D. Pa. June 1, 2022) (holding that plaintiff did not satisfy object component of constitutional analysis based on water being shut off to his toilet where, despite the unpleasant odor, he did not have to endure sewage in the toilet for more than two days and there were no allegations that the toilet overflowed or that plaintiff suffered any health consequences), *aff'd*, No. 22-2182, 2024 WL 5154024 (3d Cir. Dec. 18, 2024); *Bracey v. Price*, No. 09-1662, 2012 WL 6015727, at *16 (W.D. Pa. Dec. 3, 2012) (exposure to "the smells of feces and urine for three days" did not amount to constitutional violation); *Smith v. United States Penitentiary Lee*, No. 11-00077, 2011 WL 767165, at *1 (W.D. Va. Feb. 25, 2011) (summarily dismissing Eighth Amendment claim based on allegations that inmate could not flush the toilet in his cell, causing "noxious fumes" to build up in the housing unit); *see also Norris v. Polk*, No. 10-236, 2011 WL 489967, at *4 (D.S.C. Jan. 7, 2011) ("Plaintiff's complaints of a lack of water in his cell for two weeks is insufficient to set forth a constitutional claim, as he has failed to present any evidence showing his basic needs were not met, that he was forced to endure the alleged lack of water for extended periods, or that he suffered any injury."), *report and recommendation adopted*, 2011 WL 489965 (D.S.C. Feb. 7, 2011); *Munoz v. Ca. Dep't of Corr.*, No. 95-0346, 1996 WL 686863, at *7 (C.D. Cal. Nov. 19, 1996) ("The defendants, moreover, had a legitimate penological reason to turn off the water for a limited period of time. Some inmates, in the past, had used the water to flood the cell block, creating a dangerous condition for both prison officials and other inmates.").

### G.  Claims Against Deputy Warden Reid

Detty's claims against Deputy Warden Reid are based on her failure to respond to Detty's letters or requests about the conditions of his confinement.  (Am. Compl. at 10-11, ¶¶ 85-87; *id.*

at 12, ¶ 96.)  As previously noted, *Detty*, 2025 WL 77080, at *12, "prisoners do not have a constitutional right to prison grievance procedures."  *Gerholt v. Wetzel*, 858 F. App'x 32, 34 (3d Cir. 2021) (*per curiam*) (citing *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) and *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) (*per curiam*)).  Accordingly, Detty cannot state a claim against Reid based on her alleged improper handling of or lack of response to his grievances, or her alleged failures in implementing the grievance process.  *See Woods v. First Corr. Med. Inc.*, 446 F. App'x 400, 403 (3d Cir. 2011) (*per curiam*) ("We agree with the District Court that because a prisoner has no free-standing constitutional right to an effective grievance process, Woods cannot maintain a constitutional claim against Lucas based upon his perception that she ignored and/or failed to properly investigate his grievances." (internal citation omitted)); *Burnside v. Moser*, 138 F. App'x 414, 416 (3d Cir. 2005) (*per curiam*) (explaining that "[i]nmates do not have a constitutionally protected right to the prison grievance process" and that "a state grievance procedure does not confer any substantive constitutional right upon prison inmates" (internal quotations and citations omitted)).  Furthermore, a prison official's involvement in the grievance process or receipt of letters from an inmate generally do not establish personal involvement in the underlying constitutional violation.  *See Folk v. Prime Care Med.*, 741 F. App'x 47, 51 (3d Cir. 2018) (*per curiam*) ("Although some of these defendants were apparently involved in responding to some of Folk's prison grievances, there are no allegations linking them to the underlying incidents and thus no basis for liability based on those later grievance reviews."); *Diaz v. Warden Lewisburg USP*, 630 F. App'x 148, 151 (3d Cir. 2015) (*per curiam*) (prison officials who were administrators and who "are not themselves physicians" were not liable for deliberate indifference where plaintiff could not establish that their "involvement in the matter consisted of anything more than, at most, receiving letters from

Diaz expressing his dissatisfaction with the medical care he was receiving"); *Burk v. Crowe*, No. 19-5792, 2020 WL 42758, at *4 (E.D. Pa. Jan. 3, 2020) (plaintiff's "general allegation that he 'wrote to' Crowe, Cassidy, Budd, and Lagana 'when this happen[ed]' is too vague and undeveloped to state a plausible basis for liability against these individuals"). Accordingly, the Court will dismiss Detty's claims against Reid.

## IV.    CONCLUSION

For the foregoing reasons, the Court will dismiss the Amended Complaint in part and direct service of the Amended Complaint on the remaining Defendants so that Detty may proceed on his claims that survive screening. Those claims are: (1) deliberate indifference claims against Dowdy based on the conditions in which Detty was confined for six days in the RHU; and (2) deliberate indifference claims against Cruz and Brown based on allegations that they required Detty to clean sewage without protective gear for several hours on January 17, 2023, and February 2, 2023 respectively. Detty will not be given leave to file a second amended complaint at this time because he has already been given an opportunity to cure the defects in the claims that the Court is dismissing but was unable to do so.

An appropriate order follows.

.

**BY THE COURT:**

**/s/ Michael M. Baylson**

_____

**MICHAEL M. BAYLSON, J.**

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 24\24-6736 Detty v Beck\24-6736 Detty Screening Memo AC - conditions claims at Buck County CF.docx