IN THE UNITED STATES DISTR ICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL PAUL DETTY, | : | |
|     Plaintiff, | : | |
| | : | |
|   v. | : | CIVL ACTION NO. 24-CV-6736 |
| | : | |
| CORRECTIONS OFFICER DOWDY, | : | |
| *et al.*, | : | |
|     Defendants. | : | |

**MEMORANDUM**

**BAYLSON, J.**                                              **FEBRUARY 13, 2026**

In this civil action, Plaintiff Michael Paul Detty alleges that his constitutional rights were violated while he was incarcerated as a pretrial detainee at the Bucks County Correctional Facility ("BCCF"). After granting Detty leave to proceed *in forma pauperis*, the Court reviewed Detty's initial Complaint and dismissed it for failure to state a claim upon statutory screening, *see* 28 U.S.C. § 1915(e), without prejudice to amendment. *See Detty v. Beck*, No. 24-6736, 2025 WL 77080, at \*13 (E.D. Pa. Jan. 10, 2025). Detty filed an Amended Complaint, which the Court screened and dismissed in part, permitting him to proceed only on the following claims for damages: "(1) deliberate indifference claims against [Defendant] Dowdy based on the conditions in which Detty was confined for six days in the RHU; and (2) deliberate indifference claims against [Defendants] Cruz and Brown based on allegations that they required Detty to clean sewage without protective gear for several hours on January 17, 2023, and February 2, 2023 respectively." *Detty v. Beck*, No. 24-6736, 2025 WL 1268688, at \*12 (E.D. Pa. May 1, 2025). The Court directed service of the Amended Complaint on Defendants Dowdy, Cruz, and Brown, but was unable to effect service on Cruz. (ECF Nos. 15, 21, 24, 26.) Dowdy and Brown have filed a Motion to Dismiss for failure to state a claim and based on qualified immunity, to

which Detty has responded.[1]  (ECF Nos. 30, 35.)  For the following reasons, the Motion will be granted in part and denied in part.

## I.    FACTUAL ALLEGATIONS[2]

### A.  Conditions in the RHU

Detty brings deliberate indifference claims against Officer Dowdy based on conditions in which he was held in the RHU.  Upon Detty's transfer to the RHU on the occasion in question, another officer asked Dowdy to get Detty a bland diet tray in accordance with his "Special Diet Wristband."  (Am. Compl. at 6, ¶¶ 39-41.)  Dowdy responded that lunch was over, so Detty would have to wait for dinner, and directed Detty to go to his cell.  (*Id.* ¶ 41.)  Detty's cell in the RHU had "human feces smeared all over the walls and floor" and the sink was clogged, such that only toilet water was available.  (*Id.* at 7 ¶ 42.)  Detty asked Dowdy to address these issues, but Dowdy did not do so.  (*Id.* at 7, ¶ 43.)  Detty also asked Dowdy to add his name to the special diet list to reflect that he could only eat "Bland Diet Trays" because of his allergies and showed Dowdy his wrist band to that effect.  (*Id.* at 7, ¶ 44.)

Dowdy escorted Detty back to his cell, where he was housed for approximately six days from December 15, 2022, at 1:30 p.m. until December 20 or 21, 2022.  (*Id.* at 7, ¶ 43.)  He was initially kept on lock down for the first three shifts, during which he was not permitted to leave his cell unless nurses were checking his vitals.  (*Id.* at 7, ¶¶ 43, 45.)  After three days, he "found out from a Nurse" that he lost three to six pounds, which he attributes to the fact that he had not

---

[1] Detty's response predominately recounts the allegations in his Amended Complaint.  (ECF No. 35.)

[2] The following factual allegations are taken from Detty's Amended Complaint (ECF No. 13). The Court recounts only those allegations germane to the claims remaining in this case following screening.

been receiving his bland diet trays of food and "had been throwing up constantly" following the inhalation of fumes after a fire that broke out on the cell block where he was previously housed. (*Id.* at 7, ¶ 46.)  He began to put in daily requests to have his sink fixed, to be given showers, and for unspecified medical care.  (*Id.*)  After six days in these conditions, Detty spoke with non-defendant Lieutenant Thomas, who it appears arranged for Detty to receive a bland diet tray (the first since he arrived in the RHU) and to go to the dispensary.  (*Id.* at 7, ¶¶ 48-50.)  He was then released from the RHU and returned to C-Block, where he received a shower, and "went back to the normal Prison Routine."  (*Id.* at 7, ¶¶ 51-52.)  Detty alleges that "things went well" thereafter until he experienced flooding from toilets on the unit as discussed further below.  (*Id.* at 8, ¶ 56.)

### B.  Flooding on the Unit

Detty's second set of deliberate indifference claims are based on two occasions when his housing unit was flooded with toilet water and he was not given protective gear when assisting with the clean-up.  On January 17, 2023, Detty awoke to a "very loud noise, along with a foul smell," and saw that human feces were "flowing from [the] toilet in dark grey water."  (*Id.* at 8, ¶ 56.)  Detty alleges that he had to get up and walk in the water, which was above his ankles.  (*Id.*)

Defendant Sergeant Cruz responded to the flood and asked some of the inmates, including Detty, to clean the block for $5.00.  (*Id.* at 8, ¶ 57.)  Detty told Cruz that he worked for sanitation and "could run the 40 G[a]llon Zambonie Machine, after being equipped with Gloves, Masks, and Boots which is required when dealing with Toxic Waste."  (*Id.* at 8, ¶ 58.)  Cruz sent officers to get the equipment, and Detty and others began cleaning.  (*Id.* at 8, ¶ 59.)  However, Cruz never supplied masks or gloves.  (*Id.*)  Cruz also directed Detty to dump the 40 gallons of waste down a drain in the yard, which Detty did even though those drains were not to be used for waste.  (*Id.* at 8, ¶ 60.)

3

After five hours of work, Detty asked Cruz if he could go to the Dispensary "to get his eyes flushed out" because his eyes were burning and he had a headache. (*Id.* at 8, ¶ 62.) It is unclear how Cruz responded. After working for a total of seven hours, Detty and the other inmates signed paperwork to receive payment for their work and were locked into their cells to be fed. (*Id.* at 8, ¶ 9.) Detty asked Cruz whether they had to eat among "all this toxic waste." (*Id.* at 9, ¶ 63.) It is unclear what the condition of the unit was at that time (since it had been cleaned for the past seven hours) or how Cruz responded.

The next flooding incident occurred on February 2, 2023, when two inmates flooded Detty's unit, causing water with feces in it to flow out of his toilet and throughout his cell. (*Id.* at 9, ¶¶ 68-69.) Detty began to kick his cell door so that he "could be free from standing in human waste." (*Id.* at 9, ¶ 70.) Brown arrived at the cell and, upon seeing the waste, directed Detty and his cellmate to the day room. (*Id.* at 9, ¶ 71.) Detty told Brown that they "used the Zamboni and three Vacs" to clean up the prior flood, to which Brown responded, "here's some mops, squees, and broom that I want you to use to push it all outside in the Yard Drain." (*Id.* at 9, ¶ 72.) Detty asked Brown to supply gloves and paper masks, but Brown did not do so, although he said that he would order them hot meals once they were done. (*Id.* at 9, ¶ 73.) After working for approximately two hours, Detty asked Brown for a mask because his head was pounding, but Brown did not provide one. (*Id.* at 10, ¶ 74; *see also id.* at 9, ¶ 72.) Detty and the other inmates were provided food at about 12:30 a.m., following at least five hours of work, but Detty claims that the block "was not completely sanitized" and that they were required to eat among the "waste that was in [their] cells." (*Id.* at 10, ¶ 74.)

## II.    STANDARD OF REVIEW

"A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citing *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 871 (3d Cir. 1992). In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citations omitted) (quoting *Twombly*, 550 U.S. at 678; then quoting *Iqbal*, 556 U.S. at 678).

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). The Court construes *pro se* filings liberally. *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (*pro se* filings are construed liberally). It is the defendants' burden to show that a complaint fails to state a claim. *See*

*Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented").

### III.   DISCUSSION

Detty asserts his constitutional claims pursuant to § 1983, the statute enabling a plaintiff to raise claims for violations of the federal constitution. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Since Detty was a pretrial detainee at the time of the events in question, the Fourteenth Amendment governs his conditions-of-confinement claims. *See Hubbard v. Taylor*, 399 F.3d 150, 165-66 (3d Cir. 2005).

Prison officials have a constitutional duty to provide humane conditions of confinement, including adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates. *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (citing *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)). To establish a basis for a Fourteenth Amendment violation, a pretrial detainee must allege that his conditions of confinement amount to punishment. *Bell v. Wolfish*, 441 U.S. 520, 538 (1979). "Unconstitutional punishment typically includes both objective and subjective components." *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007). "[T]he objective component requires an inquiry into whether the deprivation was sufficiently serious and the subjective component asks whether the officials acted with a sufficiently culpable state of mind." *Id.* (internal quotations and alterations omitted) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). To satisfy the subjective component of the analysis, a prisoner generally must assert that prison officials acted with deliberate indifference,

6

meaning that they consciously disregarded a serious risk to the detainee's health or safety.  *See Wilson*, 501 U.S. at 298-99; *see Edwards v. Northampton County*, 663 F. App'x 132, 135 (3d Cir. 2016) (*per curiam*) ("[W]e agree with the District Court and find no reason to apply a different standard here as we have applied the 'deliberate indifference' standard both in cases involving prisoners and pretrial detainees." (citing *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997); then citing *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1024 (3d Cir. 1991)).

A government defendant who commits a constitutional violation may nevertheless avoid liability for damages based on qualified immunity.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To determine whether an official is entitled to qualified immunity, a court must consider whether the plaintiff's factual allegations "make out a violation of a constitutional right" that was "clearly established" at the time of the alleged misconduct.  *Id.* at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "[W]hether the violative nature of *particular* conduct is clearly established" is an inquiry that "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (cleaned up).  To be "clearly established," a legal principle must be dictated by controlling authority such that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."  *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citing *Richle v. Howards*, 566 U.S. 658, 666 (2012)).  Application of this standard requires a high degree of specificity, in that "[t]he rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"

*Id.* (quoting *Saucier*, 533 U.S. at 202). "[A] case directly on point [is not required], but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *Clark v. Coupe*, 55 F.4th 167, 181 (3d Cir. 2022) (explaining that courts first look to Supreme Court cases, then binding precedent in our circuit before considering whether "a robust consensus of cases" from other circuits and district courts clearly define a right). "The 'ultimate question' in the qualified immunity analysis 'is whether the defendant had fair warning that his conduct deprived his victim of a constitutional right.'" *Williams v. Sec'y Pa. Dep't of Corr.*, 117 F.4th 503, 515 (3d Cir. 2024) (quoting *Schneyder v. Smith*, 653 F.3d 313,329 (3d Cir. 2011)).

**A.  Claims Based on Conditions of the RHU**

Detty's claims against Defendant Dowdy pertain to the conditions in which Detty was kept in the RHU for approximately six days. Specifically, he was housed in a cell with human feces smeared on the floor and walls and in which there was no running water apart from the toilet, without access to a shower, during which time he was "throwing up constantly" and did not receive food accommodating his need for a bland diet. (Am. Compl. at 7, ¶¶ 42-51; *id.* at 11, ¶ 93.) Detty alleges that he addressed these issues with Dowdy upon his arrival to the RHU, but Dowdy did not take any action to resolve them. (*Id.* at 7, ¶¶ 42-44.) He also alleges that he lost three to six pounds in three days, which he attributes in part to not receiving his bland diet trays of food. (*Id.* at 7, ¶ 46.)

The question at this stage of the case is whether Detty's allegations and the reasonable inferences they support suggest a plausible basis for concluding that Dowdy was deliberately indifferent to Detty's health or safety such that discovery is warranted. "In determining whether [a prisoner's] conditions of confinement amount to a constitutional violation, the circumstances,

8

nature, and duration of the conditions must be carefully considered but the length of exposure is often of prime importance." *Martin v. Gearhart*, 712 F. App'x 179, 186 (3d Cir. 2017) (*per curiam*) (cleaned up) (quoting *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001)); *see also Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 326 (3d Cir. 2020) (in assessing whether conditions amount to unconstitutional punishment of detainees, courts "consider the totality of the circumstances of confinement, including any genuine privations or hardship over an extended period of time" (citing *Hubbard*, 399 F.3d at 159; then citing *Union Cnty. Jail Inmates v. Di Buono*, 713 F.2d 984, 995-96 (3d Cir. 1983)). Detty's allegations, taken as true, reflect that for five or six days in the RHU he was not given meals he was able to eat because of his allergies, such that he lost several pounds, and was housed in a cell smeared with feces with a clogged sink and only toilet water. (Am. Compl. at 7.) At this stage of the litigation, Detty has plausibly alleged objectively serious deprivations of food and sanitation. *See Pressley v. Miller*, No. 21-2826, 2022 WL 17414866, at *1 (3d Cir. Dec. 5, 2022) (*per curiam*) (vacating grant of summary judgment on conditions claim where plaintiff was housed in a RHU cell "contaminated by human feces (smeared on the walls, bed, air vent, and cell door, and covering the 'feeding slot')" where he was housed "for three days and refused his meals for much of that time because of the conditions of the cell"); *Willey v. Kirkpatrick*, 801 F.3d 51, 67 (2d Cir. 2015) ("From this body of case law, the district court discerned a circuit split where an inmate's exposure to waste lasts for three or four days. Although locating this durational divide around three or four days' exposure to human waste, the district court nevertheless found that Willey's complaint, which alleged, at a minimum, seven days' exposure, failed to state a claim. We disagree." (cleaned up)); *McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001) (holding that district court erred in dismissing complaint for failure to state a claim based on allegations that plaintiff was housed in

a "feces-covered cell" for three days: "Given the totality of the circumstances—i.e., the three-day period and the proximity of human waste—we hold that Mr. McBride alleged sufficient facts to demonstrate a sufficiently serious condition of confinement."); *Santos v. Berroa*, No. 25-6329, 2026 WL 184266, at *11 (E.D. Pa. Jan. 23, 2026) (permitting a claim to proceed past screening based on conditions of a cell where plaintiff was housed for ten days, stating that "[i]t is hard to see how requiring an inmate to reside in a feces-covered cell with a feces-caked toilet without the ability to clean it properly would be related to a legitimate penological interest"); *see also Scinto v. Stansberry*, 841 F.3d 219, 233 (4th Cir. 2016) (holding that the constitutional duty to provide inmates with adequate food "includes an obligation to provide a medically appropriate diet when necessary"); *Reed v. McBride*, 178 F.3d 849, 853 (7th Cir. 1999) (holding that "withholding food from [plaintiff] on many occasions for three to five days at a time" was objectively serious for purposes of the Eighth Amendment and reversing grant of summary judgment); *Bowen v. Lehigh Cnty. Jail*, No. 24-5534, 2024 WL 4556060, at *3 (E.D. Pa. Oct. 23, 2024) (finding that pretrial detainee stated objectively serious deprivation when he alleged that he "regularly (if not exclusively) received food trays containing foods to which he is allergic, which could aggravate his medical condition, and which have taken a toll on his mind and body tremendously" (cleaned up)).  Further, since Detty alleges that he made Dowdy aware of the issues with his cell and his need for a special diet when he arrived at the RHU, and given his allegation that another officer had asked Dowdy to secure a bland diet tray for Detty, he has adequately alleged facts supporting an inference that Dowdy was aware of these conditions but did not do anything to resolve them.  At this early stage of the litigation, these allegations are sufficient to proceed

10

against Dowdy.[3]  *See Pressley*, 2022 WL 17414866, at *3 ("Given the conditions that Pressley has described, a reasonable jury could infer that prison officials escorting Pressley to the cell necessarily would have known about the condition of the RHU cell.").

The cases relied upon by Dowdy are not to the contrary.  (ECF No. 30-1 at 11.)  In those cases, the courts concluded that the totality of the circumstances surrounding the conditions at issue—as established at summary judgment or at trial—did not amount to an Eighth Amendment violation.  *See Barney v. Pulsipher*, 143 F.3d 1299, 1311 (10th Cir. 1998) (affirming grant of summary judgment where two-day incarceration in "a filthy cell, [with] inadequate lighting and ventilation, lack of enclosures around the shower and toilet, unappetizing food, and no access to recreational facilities" did not violate the Eighth Amendment); *Ogbolu v. McLemore*, 107 F.3d 21, 1997 WL 49449, at *2 (10th Cir. 1997) (affirming grant of summary judgment where "we are not persuaded that a very short stay in a drafty cell containing a shower that splashed water on the floor for lack of a shower curtain amounted to cruel and unusual punishment within the meaning of the Eighth Amendment where, as here, the prisoner had a blanket, a bed, and food"); *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994) (finding that defendant was entitled to judgment as a matter of law following trial because, although plaintiffs were housed in cell contaminated by bodily fluids and rotting garbage, they received full cleaning supplies within twenty-four hours, although noting that the conditions were "deplorable" and the court could "easily conclude that such conditions could cause actionable harm if a prisoner were exposed to them for a much longer period of time"); *White v. Nix*, 7 F.3d 120, 121 (8th Cir.

---

[3] Dowdy alleges that, "upon notifying Off. Dowdy of this situation, Mr. Detty was promptly removed from the cell and provided access to a shower within a reasonable time."  (ECF No. 30-1 at 12.)  To the contrary, Detty alleges that the conditions "lasted around six (6) days" until his discussion with Lieutenant Thomas, (Am. Comp. at 7), which the Court must take as true for purposes of resolving the instant motion.

1993) (affirming judgment following trial based on eleven-day stay in cell where, among other things, "[t]he magistrate judge concluded that the condition of White's cell was not so unsanitary as to constitute a possible health hazard and found that, although the wire mesh of the cell did cut down on ventilation, the cell was not covered with a mixture of dried human fecal matter and food as White contended"); *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988) (affirming grant of summary judgment on conditions claim based on denial of toilet paper for five days and being housed in a "filthy, roach-infested cell": "Although Menard may merit some management criticism, at this stage the defendants' conduct is not unconstitutional, as indifferent and inconsiderate as it was in regard to this one inmate"). These cases, like the ones cited above, reflect that conditions-of-confinement claims often turn on the specific facts of each case and whether the record as a whole reflects deliberate indifference to objectively serious health risks. Where an inmate raises an inference of deliberate indifference to a serious deprivation, the ultimate constitutional determination is better made at summary judgment or at trial.

Dowdy argues that Detty does not allege that he "lacked anywhere to sit or sleep," that his mattress or bedding was soiled, or that "he was unable to traverse the cell without coming into contact with human waste" despite allegations that feces were smeared on the walls and floor and that he lacked running water. (ECF No. 30-1 at 11.) However, that is not what the pleading standard demands of him. The suggestion that he could tiptoe around his cell does refute the plausibility of Detty's allegations that his confinement for five or six days in a cell with "human feces smeared all over the walls and floor" with a "clogged" sink and no water other than "toilet water" while he was "throwing up constantly," (Am. Compl. at 7), states a constitutional violation. *See also Gaston v. Coughlin*, 249 F.3d 156, 166 (2d Cir. 2001) ("We are unwilling to adopt as a matter of law the principle that it is not cruel and unusual punishment for

12

prison officials knowingly to allow an area to remain filled with sewage and excrement for days on end.").

Dowdy also argues that he is entitled to qualified immunity on this claim because it was not clearly established at the time of the events in question that "briefly housing a detainee in an unsanitary cell violated the Fourteenth Amendment." (ECF No. 30-1 at 15.)  He further notes that "courts within the Third Circuit have consistently held that brief exposure to unpleasant or unsanitary conditions does not amount to a constitutional violation." (*Id.*)  But the cases he cites, *Hubbard*, 399 F.3d at 159, and *Thomas v. Tice*, 948 F.3d 133, 140 (3d Cir. 2020), which concerned triple celling of detainees due to overcrowding and placement of a prisoner in a dry cell for administrative reasons for four days, respectively, are not particularly factually analogous and, in any event, reflect instances where neither the constitutional nor qualified immunity question could be resolved on summary judgment.[4]  Contrary to Dowdy's argument, the case law cited above would have been sufficient to give clear guidance that housing an inmate in a feces-covered cell for five or six days, without access to running water, could have amounted to a constitutional violation.  *See Taylor v. Riojas*, 592 U.S. 7, 8-9 (2020) (*per curiam*) ("[N]o reasonable correctional officer could have concluded that, under the extreme circumstances of this case [where prisoner was confined to cell for four days that was covered, nearly floor to ceiling, in "massive amounts of feces"], it was constitutionally permissible to house Taylor in such deplorably unsanitary conditions for such an extended period of time."); *Jones v. Solomon*,

---

[4] Similarly, another case from the United States Court of Appeals for the Third Circuit, albeit addressing far worse conditions than those alleged here, found summary judgment inappropriate where an HIV positive inmate was housed for four days in a dry cell without running water while he had diarrhea.  *See Young v. Quinlan*, 960 F.2d 351, 365 (3d Cir. 1992) ("[I]t would be an abomination of the Constitution to force a prisoner to live in his own excrement for four days in a stench that not even a fellow prisoner could stand."), *superseded by statute on other grounds as stated in Nhhuis v. Reno*, 204 F.3d 65, 71 n.7 (3d Cir. 2000).

90 F.4th 198, 209 (4th Cir. 2024) ("[I]t was clearly established [in 2015] that acute exposure to sewage and severe deprivations of articles of personal hygiene violated the Eighth Amendment."); *Willey*, 801 F.3d at 67 (collecting cases from various circuit courts pertaining to housing of inmates in unsanitary cells). Especially at this stage of the case, where the facts about the specific conditions in which Detty was held are still not developed through discovery, Dowdy is not entitled to qualified immunity.

### B. Claims Based on Cleaning of Flooded Cell

Detty's claims against Lieutenant Brown are based on allegations that, upon learning the toilet flooded the cell block on February 2, 2023, with feces-laden water, Brown made him and other inmates clean the block for several hours with "mops, squees, and brooms" without supplying masks and gloves. (Am. Compl. at 9-10.) Defendant Brown argues that Detty has not described an objectively serious condition because he does not allege "that he came in direct contact with bodily fluids, nor does he plead any facts involving injury or exposure to disease." (ECF No. 30-1 at 12.) Brown further alleges that Detty has not alleged a plausible basis for deliberate indifference because the unsanitary conditions were timely addressed, he was given a mop and broom to clean up (*i.e.*, he was not required to use his bare hands), and he was given a hot meal when he finished. (*Id.* at 14.)

In general, requiring inmates to work in conditions that pose objectively serious risks to their health or safety can amount to a constitutional violation. *See generally Burrell v. Loungo*, 750 F. App'x 149, 159 (3d Cir. 2018) (*per curiam*) ("Burrell alleges that, as a result of working in the recycling center, his health and safety were endangered in multiple ways — he was exposed to toxic fumes and various unsanitary materials, he suffered from burning rashes, he was cut by glass, he was required to work in excessive heat, and he had to use broken and/or

14

unsanitary toilets.  These alleged conditions, when considered in the aggregate, are sufficient to satisfy the first prong of the Eighth Amendment test."); *Ward v. Lamanna*, 334 F. App'x 487, 488 & 491 (3d Cir. 2009) (addressing "claim against several members of the prison's staff for exposure to an unreasonable risk of serious harm from working in the prison's factory" and affirming grant of summary judgment where record showed that prison officials took remedial measures after learning of OSHA recommendations and violations); *see also Harris v. Kim*, 483 F. App'x 329, 331 (9th Cir. 2012) ("Harris's operative complaint alleges that defendants Olivarria and Williams ordered Harris to use the corrosive cleaning agent without training or protective gear, resulting in serious injury to Harris's eyes and skin, and that they knew of the cleaning agent's dangerous properties.  This is sufficient to state an Eighth Amendment violation."); *Hall v. Bennett*, 379 F.3d 462, 466 (7th Cir. 2004) ("[A] jury could infer from the electrical safety code mandating the use of protective gloves when cutting into the insulation on live wires that the defendants knew pliers alone would not protect Hall from the risk of electrocution.").  Further, "[i]nmate exposure to sewage can constitute a serious risk to inmate health and safety and satisfy the objective component" of a constitutional claim, even if an inmate does not suffer "serious medical problems" due to the exposure.  *Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir. 2001); *see also Fruit v. Norris*, 905 F.2d 1147, 1150-51 (8th Cir. 1990) (observing that "'common sense' suggests that [prison officials] should have had knowledge that unprotected contact with human waste could cause disease").  "At the same time, the frequency and duration of the condition, as well as the measures employed to alleviate the condition, must be considered when considering the objective component."  *Shannon*, 257 F.3d at 1168; *Wilson v. Bucks Cnty. Corr. Facility*, No. 23-0912, 2023 WL 2920834, at *3 (E.D. Pa. Apr. 12, 2023) ("[A] plaintiff must allege facts about the duration and extent of the deprivation

15

to establish how a basic need was not met, and must allege how he was harmed by the unsanitary conditions."). While courts have treated direct exposure to sewage seriously, claims based on brief exposures to waste or allegations that an inmate was not given adequate protective gear while cleaning waste or other fluids have met with less success. *See Florio v. Canty*, 954 F. Supp. 2d 227, 235 (S.D.N.Y. 2013) ("Florio was exposed to waste only for brief periods; it appears that his total exposure was less than a few hours. While no doubt unpleasant, these incidents are insufficiently continuous or chronic to withstand defendants' motion to dismiss." (citation omitted)); *Wyland v. Brownfield*, No. 08-1601, 2011 WL 5445305, at *5 (W.D. Pa. Nov. 9, 2011) ("With regard to the objective prong, . . . having to clean a moldy shower with backed up sewage without gloves or a mask on another single occasion simply do not give rise to a substantial risk of serious harm or challenge common standards of decency."); *Ortiz v. Dep't of Corr. of City of New York*, No. 08-2195, 2011 WL 2638137, at *8 (S.D.N.Y. Apr. 29, 2011) ("In each of these incidents, plaintiff was only exposed to waste for a relatively small number of hours [following sewage overflows]; it appears that his total exposure was probably less than 24 hours. Although unpleasant, these incidents are simply too limited to withstand a motion to dismiss"), *report and recommendation adopted sub nom. Ortiz v. Hernandez*, 2011 WL 2638140 (S.D.N.Y. July 5, 2011). *But see Thomas v. City of Philadelphia*, No. 21-0441, 2021 WL 1614411, at *5 (E.D. Pa. Apr. 23, 2021) (allowing claim to proceed where "taking the facts and reasonable inferences in the Amended Complaint as true, it is reasonable to infer that Thomas was left in a multipurpose closet that was in some respect flooded with sewage water and then exposed directly to the sewage water from the housing unit when Doe directed him to clean it without gloves or cleaning supplies apart from towels, a mop, and toilet water").

Brown makes a compelling point that Detty was given cleaning supplies such as mops, squeegees, and brooms to clean-up after the toilet overflowed and never alleges that his skin came into direct context with the feces-laden toilet water while he was cleaning it. Given the short duration of the exposure and the fact that Detty was given cleaning supplies that would have prevented direct contact with the waste, even if not protective gear, the Court concludes that Detty has fallen short of stating a constitutional claim. *See Banks v. Rozum*, 639 F. App'x 778, 783 (3d Cir. 2016) (*per curiam*) ("Banks alleges only generally that he was exposed to bodily fluids while engaged in his cleaning job, not that his skin ever came in direct contact with such fluids or that he suffered any injury or disease exposure. No constitutional violation is stated based on these allegations.").

But even if Detty had alleged enough to proceed on this claim, which is marginal at best, the Court agrees that Brown would be entitled to qualified immunity. The constitutional right at issue here is whether inmates have a right to receive protective gear when cleaning sewage or other bodily fluids. As noted above, exposing inmates to direct, prolonged contact with waste raises health and constitutional concerns, *see Fruit*, 905 F.2d at 1151 ("[C]ourts have been especially cautious about condoning conditions that include an inmate's proximity to human waste."), but the Court has not identified any binding precedent (or even a consensus from other circuit courts) that would have provided clear notice that failing to provide Detty with masks and gloves under the circumstances of this case would amount to a constitutional violation. *See Rish v. Johnson*, 131 F.3d 1092, 1101 (4th Cir. 1997) ("[T]here is no clearly established law dictating that prison officials are deliberately indifferent to a substantial risk of bodily harm if they fail to provide equipment to inmates to ensure that they may follow universal precautions in performing the duties of an orderly."); *Good v. Olk-Long*, 71 F.3d 314, 316 (8th Cir. 1995) ("The prison

employees did furnish protective equipment and, as such, even though they should have followed prison policy in furnishing coveralls, we cannot say, *under the circumstances of this case,* that they violated clearly established constitutional law in failing to provide additional equipment."); *Thurston v. Cumberland County.*, No. 13-00013, 2014 WL 294487, at \*1 & \*8-11 (D. Me. Jan. 27, 2014) (concluding, upon summary judgment, that defendant was entitled to qualified immunity when plaintiff was "made to clean the blood of a fellow inmate from the floor of the Jail without adequate protective supplies and in violation of the Jail's biohazard policy"). Accordingly, even if Detty has alleged facts sufficient to state a plausible constitutional claim based on the failure to provide him with a mask and gloves while he cleaned, Brown is entitled to qualified immunity.

Although Cruz did not move to dismiss because she has not yet been served, the Court will dismiss the claim against her—which is also based on the failure to provide Detty with a mask and gloves while he cleaned up following the earlier flooding incident—based on the same principles. Since Detty is proceeding *in forma pauperis*, the Court may independently screen his Amended Complaint and dismiss it "at any time" if, among other things, it fails to state a claim or seeks monetary relief from an immune defendant. 28 U.S.C. § 1915(e)(2)(B)(ii), (iii); *Brown v. Sage*, 941 F.3d 655, 662 (3d Cir. 2019) (*en banc*) ("To repeat, the statute requires a court to dismiss an IFP complaint 'at any time' if it determines that the complaint is frivolous, malicious, or fails to state a claim."). The allegations against Cruz are even less serious than those against Brown since it appears that Detty participated in the clean-up voluntarily for pay and was able to clean the sewage water with machines. As with the allegations against Brown, he does not claim that he came into direct contact with any sewage, only that he was not given masks and gloves (his allegations suggest he was given boots). The Court's conclusions as to the claims against

Brown are therefore also fatal to his claims against Cruz, such that further efforts to serve her would be "an idle exercise."  *See Talley v. Clark*, 111 F.4th 255, 265 (3d Cir. 2024).

IV.    **CONCLUSION**

For the foregoing reasons, the Court will dismiss with prejudice Detty's claims against Cruz and Brown based on their alleged failure to provide him with protective gear while cleaning up from the flooded toilets because further amendment would be futile.  However, the Court will deny Dowdy's Motion to dismiss the claims against him.  An appropriate order follows, which directs Dowdy to answer the Amended Complaint.

.

BY THE COURT:

/s/ Michael M. Baylson

MICHAEL M. BAYLSON, J.

19